UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALVARO CARVAJAL,                              :

                    Petitioner,              :        07 Civ. 10634 (CM) (AJP)

            -against-                         :        **REPORT AND RECOMMENDATION**

DALE ARTUS, Superintendent,                   :
Clinton Correctional Facility,
                                              :
                    Respondent.
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Colleen McMahon, United States District Judge:**

_____Pro se petitioner Alvaro Carvajal seeks a writ of habeas corpus from his April 1, 1996

conviction, after a jury trial in Supreme Court, New York County, of one count of second degree

conspiracy and three counts of first degree criminal possession of a controlled substance, and

aggregate sentence totaling twenty-six years imprisonment.  (Dkt. No. 1: Petition ["Pet."] ¶¶ 1, 3-5;

Dkt. No. 10: State Br. at 1 & n.1.)  The main issue raised by this petition is whether New York State

could prosecute Carvajal for drug possession (as opposed to conspiracy or attempted possession)

when both Carvajal and the drugs were located in California, although intended for transportation

to and distribution in New York.

            Carvajal's habeas corpus petition asserts that:  (1) the trial court lacked territorial

jurisdiction over the three drug possession counts (Pet. at 31-37); (2) trial counsel was ineffective

for failing to: (a) "object to, withdrawal from consideration by the jury, and consequential waiver of the 'territorial jurisdiction' issue from the case"; (b) raise the "minimization" issue before trial; (c) file motions to suppress evidence; (d) hire a translator to interpret the wiretap evidence; (e) question wiretap transcribers before trial; and (f) object to the monitors' oaths not being turned over prior to trial (Pet. at 32-33, 37, 43; Dkt. No. 9: Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 52-54; Litsky Aff. Ex. L: Carvajal Motion to Vacate Judgment ["440 Motion"] Aff. at Points III & VIII); (3) Carvajal was deprived of his right to counsel of his choice (Pet. at 37-42, 44-45); (4) the trial court lacked jurisdiction over Carvajal because a grand jury failed to indict him since only the superceding indictment, not the original indictment, had Carvajal's name in the caption (Pet. at 44); and (5) the trial court's "refusal to consider [Carvajal]'s pro se pre-trial motions was reversible error where . . . the motions were meritorious and designed to compensate for appointed counsel's failure to conduct discovery and submit appropriate pretrial motions" (Carvajal 440 Motion Br. at Point II).[1]

For the reasons set forth below, Carvajal's habeas petition should be DENIED, but a certificate of appealability should issue as to the territorial jurisdictional issue only.

---

[1]     To the extent that Carvajal's petition may be deemed to include other claims from Carvajal's First Department brief, those claims are procedurally barred. (See Point V below.)

# FACTS

## Background

Petitioner Alvaro Carvajal's conviction arose from a narcotics conspiracy in which narcotics were transported from San Francisco to New York City. (See Dkt. No. 10: State Br. at 2.) Freddy Lasso and Louis Grueso ran the operation in New York, partnering with west coast based Carvajal, and "Chicanero" was responsible for the drugs' cross-country transportation. (See State Br. at 2.)

In April and May 1994, the Drug Enforcement Task Force intercepted a series of calls among Carvajal, Grueso, Freddy Lasso and Chicanero relating to the organization's transport of drugs from San Francisco to New York in vehicles with "traps," i.e., secret compartments. (See State Br. at 2.) Acting on the information obtained from the intercepted calls and surveillance, task force agents stopped Chicanero employee Hans Vargas at the San Francisco airport and recovered twenty-one kilograms of cocaine from a secret compartment inside the white Mazda that Vargas was driving. (See State Br. at 2; Dkt. No. 9: Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 17.) Later the same day, task force agents stopped Chicanero employee Hector Rivas in a blue Volvo in San Francisco and recovered thirty kilograms of cocaine from a secret compartment in the blue Volvo. (See State Br. at 2-3; Carvajal Ct. App. Br. at 18.)

On June 16, 1994, after learning that the organization stored its drugs in a "stash house" in a San Francisco suburb, agents recovered twenty-three kilograms of cocaine and $433,000 from the stash house. (See State Br. at 3; Carvajal Ct. App. Br. at 19.)

In September 1994, Carvajal, Freddy Lasso, Grueso and other co-conspirators were arrested. (See State Br. at 3; Carvajal Ct. App. Br. at 20.) In searches incident to the arrests, the task force agents recovered documents, credit cards and other information linking Carvajal, Freddy Lasso and the other conspirators to each other. (See State Br. at 3, 17-19; Carvajal Ct. App. Br. at 19.)

On October 5, 1994, the grand jury charged Carvajal (and others) with one count of second degree conspiracy and three counts of first degree criminal possession of a controlled substance. (See Litsky Aff. Ex. A: Indictment; State Br. at 3.)[2]

**Carvajal's Trial**

In February 1996, Carvajal, along with co-defendants Louis Grueso, Freddy Lasso and Raul Lasso,[3] proceeded to trial before Justice Bonnie Wittner and a jury. (Dkt. Nos. 6-8: Trial Transcript ["Tr."].)

---

[2]     The same grand jury indictment charged Louis Grueso, Freddy Lasso, Raul Lasso and Nelson Lasso with second degree conspiracy. (State Br. at 3; Litsky Aff. Ex. E: Carvajal 1st Dep't Br. at 3.) The grand jury also charged Grueso and Freddy Lasso with three counts of first degree criminal possession of a controlled substance and charged Freddy Lasso and Raul Lasso with first degree criminal sale of a controlled substance and an additional count of first degree criminal possession of a controlled substance. (See State Br. at 3; Carvajal 1st Dep't Br. at 3-4.) The grand jury charged five other defendants in the indictment: Hans Vargas, Carlos Lasso, Omar Castro, Soraya Palacios and Omar Gonzalez. (See State Br. at 3.) Vargas, Carlos Lasso, Castro and Palacios pled guilty to felony conspiracy or drug charges. (See State Br. at 3.) Gonzalez was never arrested. (See State Br. at 3.)

[3]     The Court will refer to the various Lasso defendants by their first names to avoid confusion; no disrespect is intended.

**The Prosecution Case at Trial**

The New York Drug Enforcement Task Force began investigating Columbian narcotics trafficking organizations in June 1993 and, by the fall, they were focusing on W&G Auto Repair in Queens and its owner/manager Freddy Lasso. (Cabbell: Tr. 833, 843-46.) Through surveillance and intercepted phone calls, the agents learned that New York based Freddy and Louis Grueso were partners with California based Carvajal in a drug trafficking organization. (Cabbell: Tr. 933-36, 2482-84, 2586-87, 2723.) Victor Hugo worked for Carvajal in California. (Cabbell: Tr. 943, 2723-24.) "Chicanero" (who was never arrested and so never identified) managed the transportation of the narcotics and employed Hans Vargas, Hector Rivas and "Moncada" to transport the narcotics from California to New York. (Cabbell: Tr. 941-43, 945, 2590, 2724-25.)

On April 13, 1994 at 4:47 p.m., Freddy Lasso, who was in New York, called Carvajal in San Francisco. (Cabbell: Tr. 949-53.) Carvajal explained that he was waiting for Chicanero to report back about Moncada's delay in transporting drugs to New York. (Wiretap: Tr. 953-57.) At 11:24 p.m., Freddy again called Carvajal. (Cabbell: Tr. 968; Wiretap: Tr. 970, 2591.) Carvajal told Freddy that Moncada's blue car was overheating and that, if necessary, Moncada would transfer the drugs to another car. (Cabbell: Tr. 973-76; Wiretap: Tr. 970-73.)

On April 14, 1994 at approximately 8:05 p.m., Freddy Lasso called Chicanero in Chicago and told him that Omar Gonzalez was driving to Chicago with a new car. (Cabbell: Tr. 986-87, 989; Wiretap: Tr. 987-88.) Chicanero agreed to safeguard the drugs until Gonzalez arrived. (Cabbell: Tr. 989; Wiretap: Tr. 988.) Fifteen minutes later, Freddy called Carvajal in San Francisco and informed Carvajal of the arrangement. (Cabbell: Tr. 989-90; Wiretap: Tr. 990-92.) Carvajal

responded that Grueso and Freddy would need to pay Moncada $20,000 for transportation expenses. (Cabbell: Tr. 997-98; Wiretap: Tr. 992-93.) Freddy agreed, and added that he was looking to buy some Volvos with "trap[s]." (Cabbell: Tr. 999-1000; Wiretap: Tr. 993-95.) Carvajal gave Chicanero's beeper number to Freddy. (Cabbell: Tr. 1000; Wiretap: Tr. 995.)

On April 16, 1994 at 3:09 p.m., Freddy Lasso (in New York) called Carvajal (in San Francisco) informing Carvajal that Gonzalez would transport the drugs to New York in the blue car. (Cabbell: Tr. 1014-15, 1031-35; Wiretap: Tr. 1015-17.) Freddy also told Carvajal that five kilograms of cocaine were missing, which Freddy and Carvajal surmised were stolen by Chicanero. (Cabbell: Tr. 1035-37; Wiretap: Tr. 1021-22, 2596-97.)

On April 17, 1994, at 5:56 p.m., Freddy Lasso and Chicanero arranged for Moncada to park the car at a McDonald's on 204th Street and Northern Boulevard in Queens, and leave the keys inside the car so that Gonzalez could pick up the car, retrieve the narcotics, and replace the narcotics with money for Moncada. (Cabbell: Tr. 1044, 1049-52, 1054, 1062-63; Wiretap: Tr. 1047-49.) Investigator Frederick Cabbell and other agents went to the McDonalds but did not see a blue Volvo in the area. (Cabbell: Tr. 1054, 2589-90.) At 11:27 p.m., Freddy (in New York) called Carvajal (in San Francisco) and told him that Grueso was pleased that the exchange between Gonzalez and Moncada was successful. (Cabbell: Tr. 1055-56, 1059-63; Wiretap: Tr. 1056-59.)

On April 28, 1994, DEA Special Agent Juan Arrivillaga observed a white Mazda driven by Gonzalez pull up in front of Freddy Lasso's house. (Arrivillaga: Tr. 1111-12.)

On May 13, 1994, at approximately 1:07 p.m., in a phone call to W&G, Caleno, a worker for the organization, asked Freddy Lasso for Carvajal's phone number because Carvajal had

just arrived in New York from San Francisco. (Cabbell: Tr. 1575-78.) Freddy gave Caleno Carvajal's phone number and hotel room number. (Cabbell: Tr. 1577.) Caleno told Freddy that the license plates were ready and Freddy responded that he would call Caleno when he had money to buy the plates. (Cabbell: Tr. 1577-78, 2600.)

On May 14, 1994, Carvajal, who was in New York, called Chicanero and Hugo in San Francisco on Freddy Lasso's cell phone. (Cabbell: Tr. 1580-81; Wiretap: 1581-82, 1588-89.) Carvajal instructed Chicanero to retrieve the keys to the blue car from Moncada and give them to Hugo, and that Chicanero should drive the white car. (Cabbell: Tr. 1589-93; Wiretap: Tr. 1582-83, 1585-88.) Carvajal informed Chicanero that Carvajal was bringing the license plates and registration for the blue car with him. (Cabbell: Tr. 1591-93; Wiretap: Tr. 1586-87.) Carvajal explained that he was assuming responsibility for Moncada's and Chicanero's traveling expenses. (Cabbell: Tr. 1592; Wiretap: Tr. 1586-87.)

On May 16, 1994, at approximately 3:15 p.m., Grueso, Carvajal and an unidentified man holding a white plastic bag left W&G and drove to JFK Airport in a blue Taurus. (Cabbell: Tr. 1593-95, 2693-95; McGuire: Tr. 1389-93, 1880-83, 1886, 1900.) As they entered the terminal, the unidentified man handed the white plastic bag to Carvajal, who boarded a flight to San Francsico. (Cabbell: Tr. 1595-96, 2694-97, 2701; McGuire: Tr. 1393-94, 1398-99, 1887-88, 1901-02, 1905-09.)

At 7:13 p.m., while Carvajal's plane was en route from New York to California, Freddy Lasso called Victor Hugo in San Francisco and discussed that Chicanero, Hugo and Moncada should wait until Carvajal arrived to decide whether Moncada should drive the white car that smelled of narcotics, or use the blue car instead. (Cabbell: Tr. 1600-04.)

On May 17, 1994, at 1:47 p.m., Grueso (in New York) called Carvajal (in San Francisco) and discussed Chicanero's preparations for Moncada to drive the blue car. (Cabbell: Tr. 1606, 2604-06; Wiretap: Tr. 1421-25.) Carvajal called Freddy Lasso (in New York) and commented that the police had searched his luggage at the airport and that he was glad that he carried the license plates on board. (Cabbell: Tr. 1609-10, 2606; Wiretap: Tr. 1429-30.) Carvajal told Freddy that Carvajal would send the "lady" in the green car, Moncada in the blue car, and deal with the white car later. (Cabbell: Tr. 1611; Wiretap: Tr. 1431.) Grueso and Freddy directed Carvajal to "bathe the girls of the white car," meaning remove the cocaine's "pungent odor" from the white car. (Cabbell: Tr. 1611-13, 2609-10; Wiretap: Tr. 1432.)

At 2:27 p.m., Freddy Lasso (in New York) called Carvajal (in San Francisco) and said that Grueso wanted Carvajal to leave the white car as is and to "fill up the space for the blue and green" cars. (Cabbell: Tr. 1613-15, 2610; Wiretap: Tr. 1432-33.) Freddy and Carvajal also discussed how many kilograms of cocaine should be placed in each car. (Cabbell: Tr. 1615-16; Wiretap: Tr. 1434-35.)

At 5:29 p.m., Freddy Lasso (in New York) called Carvajal (in San Francisco). (Cabbell: Tr. 1616-17; Wiretap: Tr. 1435.) Carvajal told Freddy that Carvajal planned to place twenty-one kilograms of cocaine in the white car so that Vargas could pick it up. (Wiretap: Tr. 1436-38; Cabbell: Tr. 1617-20.) Carvajal asked Freddy to inform Grueso that Carvajal would attempt to send out the white, green and blue cars. (Cabbell: Tr. 1619-20; Wiretap: Tr. 1440.)

At 8:25 p.m., Det. McGuire followed Carvajal and Willy Lasso, who were in Carvajal's BMW, to London and Perjur Streets in San Francisco. (McGuire: Tr. 1442-43.) Willy

Lasso removed two white bags and a gym bag from a parked green Volvo with Pennsylvania license plates, and handed the items to Carvajal, who stowed them in his BMW. (McGuire: Tr. 1443, 1445.) Carvajal and Willy drove away in the BMW. (McGuire: Tr. 1443, 1445.) About an hour later, Carvajal, Willy and Hugo drove in the BMW back to the green Volvo. (McGuire: Tr. 1446-47.) Hugo drove the Volvo to a nearby restaurant, and Carvajal and Willy followed in the BMW. (McGuire: Tr. 1447.)

On May 18, 1994, at 1:30 p.m., Det. McGuire and Investigator O'Keefe unsuccessfully looked for the green Volvo near the previous evening's restaurant. (McGuire: Tr. 1459-60.) They did, however, see the white Mazda that agents had previously seen in New York in front of Gonzalez and Freddy Lasso's houses. (O'Keefe: Tr. 1473-74; McGuire: Tr. 1460-66, 1468-70.) Although the Mazda now had Pennsylvania license plates instead of New York plates, Investigator O'Keefe confirmed, by checking the Vehicle Identification Number, that it was the same car. (McGuire: Tr. 1461-66, 1468-70; O'Keefe: Tr. 1474-78, 1832-36.)

On May 19, 1994, at approximately 12:30 p.m., Hugo drove a blue Volvo from Hector Rivas' house in San Francisco to a corner nearby and parked. (Nichols: Tr. 1487-89, 1491, 1639-40.) Carvajal drove up, positioned his BMW so that its driver's side door was next to Hugo's, and handed a white package or towel to Hugo. (Nichols: Tr. 1489-91, 1640-45.)

At 3:00 p.m., Hugo drove the blue Volvo to a supermarket. (McGuire: Tr. 1494-95.) Hugo entered the supermarket and exited carrying packages, which he put in the blue Volvo. (McGuire: Tr. 1495-96.) Carvajal arrived in his BMW, and Hugo and Carvajal looked at each other. (McGuire: Tr. 1496-98.) Carvajal called Freddy Lasso (in New York) and told him that Hugo had

parked the blue Volvo containing the cocaine at a supermarket. (McGuire: Tr. 1498; Cabbell: Tr. 1628-31.) Hugo drove away in the blue Volvo. (McGuire: Tr. 1498,1511; Cabbell: Tr. 2619-20.)

At 8:11 p.m., Carvajal called Freddy Lasso (in New York), advising Freddy that Carvajal was waiting for Vargas to "switch" cars and drive the white Mazda. (Cabbell: Tr. 1632-33.) Two minutes later, Freddy called and Carvajal told him that the white car was parked and waiting to be picked up by Vargas. (Cabbell: Tr. 1633.) Carvajal also assured Freddy that he had removed the narcotics from the stash house. (Cabbell: Tr. 1634-35, 2622.)

Meanwhile, Hugo parked the blue Volvo at the Serramonte Shopping Center and walked away. (McGuire: Tr. 1511.) At 9:26 p.m., Carvajal called Freddy Lasso (in New York) and informed Freddy that a woman may have already taken the blue Volvo, and that Vargas would be taking the white Mazda. (Cabbell: Tr. 1635-36; Wiretap: Tr. 1512-13.) Carvajal re-confirmed that he had removed the narcotics from the stash house. (Cabbell: Tr. 1635-36; Wiretap: Tr. 1513.)

Deputy Sheriff Gilbert Rodriguez of the San Francisco County DEA Task Force observed Vargas driving a white Mazda with Pennsylvania license plates heading towards the San Francisco airport. (Rodriguez: Tr. 1762-64, 1767, 2042-43.) Sheriff Rodriguez and his surveillance team stopped the Mazda just before it entered the airport and obtained Vargas' permission to search the car. (Rodriguez: Tr. 1764-67, 2043, 2050.) The agents did not find any narcotics during their brief search and released Vargas. (Rodriguez: Tr. 1767-68, 2043-45.) Agents followed as Vargas parked in a garage and entered the airport. (Rodriguez: Tr. 1769.) While Vargas was inside the airport, Freddy Lasso (in New York) called Carvajal and Chicanero, and learned that Vargas' car had been stopped and searched, but that the trap containing the narcotics had not been found. (Cabbell:

Tr. 1797, 1815-19, 1824-25; Wiretap: Tr. 1797-99; O'Keefe: Tr. 1839.)  Vargas was afraid to return to the car, but Carvajal assured Freddy that Carvajal would pressure Chicanero to pick up the Mazda.  (Cabbell: Tr. 1817, 1823; Wiretap: Tr. 1798-805, 1808.)  Freddy directed that Vargas take the Mazda and that Hector Rivas pick up the blue Volvo from the Serramonte Shopping Center immediately.  (Cabbell: Tr. 1816, 1819-21, 1823; Wiretap: Tr. 1806-14.)

Approximately twenty minutes after entering the airport, Vargas returned to the car.  (Rodriguez: Tr. 1769.)  Vargas consented to Sheriff Rodriguez's request to search the car again.  (Rodriguez: Tr. 1770, 2047, 2052-53; O'Keefe: T. 1826, 1839, 1852.)  The agents recovered twenty-one kilograms of cocaine from hidden compartments in the panels of the two rear car doors and a W&G business card with Gonzalez's beeper number on the back from Vargas' person.  (Steinhauer: Tr. 1790-96; Rodriguez: Tr. 1770- 81, 2046; O'Keefe: Tr. 1826-31, 1852-53; Cabbell: Tr. 2254-55.)

At approximately 8:30 p.m., Carvajal drove his BMW to the Serramonte Shopping Center, parked near the blue Volvo for a few minutes, and drove away.  (Nichols: Tr. 1517-18, 1646, 1648-51; McGuire: Tr. 1921.)  Between 9:30 and 10:30 p.m., Hector Rivas and Sylvia Jeffrey got into the blue Volvo.  (Nichols: Tr. 1514-17, 1646; Warren: Tr. 1520-22.)  Police Sgt. John Warren and DEA surveillance team members arrested Rivas and Jeffrey.  (Nichols: Tr. 1515-18, 1651-52; Warren: Tr. 1523.)  The team recovered thirty kilograms of cocaine from a trap behind the dashboard and a piece of paper with Freddy Lasso's beeper number from Rivas' person.  (Warren: Tr. 1523-40, 1555, 1558-59, 1563-66; Nichols: Tr. 1654, 1657; Hall: Tr. 1663-76.)

On May 20, 1994 at 3:10 p.m., Freddy Lasso (in New York) called Carvajal, who explained that Rivas was under investigation and that Chicanero was going to Los Angeles and from

there to Chicago. (Cabbell: Tr. 1925-26, 1930, 1932-33; Wiretap: Tr. 1927, 1929.) Carvajal also informed Freddy that the police had raided the stash house, but that Hugo had taken the narcotics to a friend outside of town. (Cabbell: Tr. 1930-32; Wiretap: Tr. 1927-28.) Freddy suggested that Carvajal rent an apartment "outside of town" to store the narcotics until a worker retreived them. (Cabbell: Tr. 1931; Wiretap: Tr. 1928.)

In a subsequent call, Carvajal told Freddy Lasso that Carvajal blamed Hugo for the discovery of the stash house and the seizure of cocaine from the white and blue cars because Hugo had brought undue attention to himself and the organization when he threatened a woman and told her about the narcotics organization. (Cabbell: Tr. 1954-56; Wiretap: Tr. 1933-36, 1938-43, 1947.) Freddy proposed hiding the narcotics and stated that he hoped that the narcotics in the green car would be safe so that the organization could still break even. (Cabbell: Tr. 1967; Wiretap: Tr. 1942, 1948, 1952.)

At 10:42 p.m., Carvajal called Freddy Lasso (in New York), stating that Chicanero had given the white Mazda to Hugo and was concerned about the drugs that had been removed from the stash house prior to the raid. (Cabbell: Tr. 1969-70, 1990-92, 2001; Wiretap: Tr. 1970-71.) A man in the house that police questioned had helped Hugo remove the twenty-one kilograms of cocaine worth over $200,000 from the house. (Cabbell: Tr. 2001.) Carvajal directed Freddy to form a plan with Grueso to get Chicanero back to New York so that Freddy could confront Chicanero with whether Chicanero took the cocaine from the white car that the police seized. (Cabbell: Tr. 1992-2000, 2002; Wiretap: Tr. 1970, 1975-76, 1980-90.) Carvajal expressed hope that Grueso could obtain a gun to induce Chicanero to be honest. (Cabbell: Tr. 2002, 2627-28; Wiretap: Tr. 1989-90.)

At approximately 10:54 p.m., Grueso called Freddy Lasso, who told him about Carvajal's suggestion that someone "grab" Chicanero. (Cabbell: Tr. 2003-15, 2018; Wiretap: Tr. 2008.) Freddy explained that Rivas and Jeffreys were in jail. (Cabbell: Tr. 2015; Wiretap: Tr. 2008-09.) Grueso suggested that his brother help "get" Chicanero, and Freddy agreed. (Cabbell: Tr. 2016-18; Wiretap: Tr. 2001-13.)

On May 23, 1994 at approximately 5:42 p.m., Freddy Lasso called a pay phone at JFK Airport and spoke to Vargas. (Cabbell: Tr. 2241, 2251-52; Wiretap: Tr. 2241-42.) Vargas explained that law enforcement agents had photgraphed and fingerprinted him and confiscated the white Mazda. (Cabbell: Tr. 2252-54; Wiretap: Tr. 2241-49.)

On the evening of June 3, 1994, DEA agent William Sicord observed Carvajal and Omar Gonzalez drive to 277 Canyon Drive in Daly City, outside of San Francisco. (Sicord: Tr. 2161, 2164-66, 2207-08.) Carvajal entered the open garage, talked to an unknown man and then returned home. (Sicord: Tr. 2166-70, 2205.)

On June 6, 1994, Freddy Lasso's brother Raul arranged to sell cocaine to "Tolima" in Queens. (Cabbell: Tr. 1088-89, 1092, 2513-14; Wiretap: Tr. 1089-91.) After hearing this conversation via wiretap, law enforcement agents went to the sale site and observed Raul make a call. (Defrancisci: Tr. 1201-03, 1225-28, 1240, 1243, 1245, 1272; Starling: Tr. 1301-04, 1307, 1320-21, 1369-70.) Raul called Freddy and told Freddy that he was waiting to meet Tolima. (Cabbell: Tr. 1096-98; Wiretap: Tr. 1095-96.) Raul ended his phone call when a Datsun drove up with Yuri Acosta and another man inside. (Defrancisci: Tr. 1203-05, 1212, 1214, 1228-30, 1246, 1250-51; Starling: Tr. 1308-09, 1312, 1353, 1366.) Raul got into the Datsun, which drove for two

blocks, Acosta and the other man got out, and Raul drove away in the Datsun. (DeFrancisci: Tr. 1204-05, 1230-33, 1246, 1250-52, 1271, 1275; Starling: Tr. 1309-14, 1353-54, 1366.) About twenty minutes later, Raul got out of the Datsun, Acosta and the other man got in and drove away. (Defrancisci: Tr. 1209-10, 1234-39, 1252; Starling: Tr. 1315-19, 1321-22, 1357, 1367.) A few minutes later, Acosta got out of the Datsun carrying a "weigh[t]ed" white and red plastic bag, and entered the back seat of a Buick. (Defrancisci: Tr. 1212, 1252-55; Starling: Tr. 1322-23, 1326-29, 1331.) Police stopped the Buick and recovered the white and red bag, containing almost three kilograms of cocaine, from the Buick's back seat floor. (Defrancisci: Tr. 1215-16, 1257-64; Stec: Tr. 1279-98; Starling: Tr. 1323-26, 1329-38, 1360-61.)

On June 15, 1994, at approximately 9:50 p.m., Sheriff Rodriguez and DEA Task Force Field Supervisor Mark Scheffler knocked on the door of 277 Canyon Drive, Jose Gonzalez opened the door and consented to a search of the house. (Rodriguez: Tr. 2020-21, 2028, 2054-55, 2069-70, 2072, 2079-82; Scheffler: Tr. 2084, 2088-89, 2097-98, 2100-03, 2106.) The agents recovered twenty-three kilograms of cocaine inside a large duffle bag in the bedroom closet and $433,070 in another bedroom. (Rodriguez: Tr. 2021-35, 2053, 2057-58, 2073-74, 2080; Scheffler: Tr. 2084-88, 2096, 2098-99, 2100; Deeg: Tr. 2109-15.) Sheriff Rodriguez heard, but did not see, a car enter the garage and leave seconds later. (Rodriguez: Tr. 2040-41, 2076-77.)

On June 16, 1994, at 9:33 a.m., Freddy Lasso called Grueso, informing Grueso that Carvajal had told Freddy earlier that morning that Carvajal and Moncada entered the stash house garage at 277 Canyon Drive, saw some strange people inside and left. (Cabbell: Tr. 2263, 2277-79; Wiretap: Tr. 2279-83.) Freddy stated that $400,000, which belonged to another drug dealer named

Tabla, and narcotics were inside the house. (Cabbell: Tr. 2286-87, 2289-90; Wiretap: Tr. 2280-86.)

Freddy told Grueso that if "'something has happened there, Alvaro [Carvajal] will be responsible for

that.'" (Cabbell: Tr. 2287-88; Wiretap: Tr. 2281.)

      At 10:51 a.m., Freddy Lasso (in New York) called Carvajal, who stated that Jose

Gonzalez, a member of Tabla's organization, was inside the house during the raid. (Cabbell: Tr.

2291-92, 2297; Wiretap: Tr. 2293-94.) Carvajal explained that he had allowed Gonzalez to store

his money inside the house in exchange for Gonzalez guarding the drugs. (Cabbell: Tr. 2298;

Wiretap: Tr. 2294-95.) At 12:32 p.m., Carvajal spoke with Freddy and Grueso in New York, re-

explaining what had occurred in the garage the previous evening. (Cabbell: Tr. 2298-300, 2637-38;

Wiretap: Tr. 2301-02.) Grueso threatened Carvajal, giving Carvajal forty-eight hours to deliver the

drugs to Grueso in New York. (Cabbell: Tr. 2307, 2637-38, 2641; Wiretap: Tr. 2302-05.) Grueso

also stated that he would have to pay for the twenty-one kilograms of cocaine that the police seized

from the white Mazda. (Cabbell: Tr. 2308-09, 2638-40; Wiretap: Tr. 2304-05.)

      Four minutes later, Freddy Lasso spoke to Carvajal and Willy Lasso. (Cabbell: Tr.

2309-10, 2319.) Willy explained what had occurred the previous night in the garage. (Wiretap: Tr.

2311-12.) Carvajal defended his actions and told Freddy that he doubted that the police had been

the people in the house and explained why Willy had not guarded the money and drugs at the house.

(Cabbell: Tr. 2331; Wiretap: Tr. 2313-16, 2322-30.) Freddy remarked that, "at least that stuff was

well hidden in the closet," and Carvajal agreed. (Wiretap: Tr. 2322.) Freddy surmised that the

narcotics could still be in the house. (Cabbell: Tr. 2333; Wiretap: Tr. 2329-30.)

At 6:19 p.m., Freddy Lasso called Carvajal and discussed which people knew that the drugs were stored at the Canyon Drive house. (Cabbell: Tr. 2333-34, 2375; Wiretap: Tr. 2342, 2349.) Freddy told Carvajal that Grueso was not willing to pay for the loss of the stash house narcotics and chastised Carvajal for failing to guard the drugs. (Cabbell: Tr. 2375-76; Wiretap: Tr. 2343-45.) Freddy and Carvajal suspected that law enforcement agents had been following organization members. (Cabbell: Tr. 2376-78; Wiretap: Tr. 2337, 2340-41, 2344, 2346, 2348.) Freddy directed Carvajal to load up a car and transport the drugs to New York as soon as possible and Carvajal agreed. (Cabbell: Tr. 2378; Wiretap: Tr. 2347-48.)

On September 13, 1994, Det. McGuire observed Omar Gonzalez drive to W&G a green Volvo bearing Pennsylvania plates, which looked like the green Volvo Det. McGuire had observed in California. (McGuire: Tr. 1448-51.)

On September 23, 1994, Det. Horan arrested Freddy Lasso in front of Freddy's house. (Horan: Tr. 2416-17, 2456-58.) Task force members recovered briefcases and a safe containing phone books and other documents linking Freddy to Carvajal, Chicanero, Grueso, Tolima and the white Mazda. (Horan: Tr. 2418-22, 2426; Cabbell: Tr. 2504-06, 2513-19.)

At 11:25 a.m., Agent Starling arrested Grueso near the New York DEA Office. (Starling: Tr. 1346-49, 1372-73.)

On September 24, 1994, Agent Sandee Tharp arrested Carvajal in front of Carvajal's home and recovered from Carvajal documents linking him to Freddy Lasso, Chicanero and others. (Tharp: Tr. 2142-46, 2152-54, 2657-58.) Pursuant to search warrants for Carvajal's home, record store and BMW, Agent Sicord recovered W&G business cards, phone books listing Freddy's and

W&G's numbers, credit cards and statements in Freddy's name, a receipt from Carvajal's stay at the La Guardia Airport Holiday Inn Crown Plaza on May 12 to 16, 1994, and a card and a Holiday Inn notepad that each listed Chicanero's beeper number. (Sicord: Tr. 2171-83; Cabbell: Tr. 2491-99, 2501-02; Tharp: Tr. 2159.)

On October 3, 1994, Det. Horan and other task force members went to the garage next to W&G. (Horan: Tr. 2429-30, 2446.) William Suaza, co-owner of W&G with Freddy Lasso and the garage's landlord, opened the garage. (Horan: Tr. 2430, 2446-47, 2450, 2472; Cabbell: Tr. 2486-90.) Three cars with traps identical to those in the blue Volvo seized in California were in the garage. (Horan: Tr. 2431-33, 2436-38, 2442-45.)

**The Defense Case at Trial**

Carvajal and his co-defendants did not present any evidence at trial. (Tr. 2754.)

**Charge Conference and Jury Instructions**

During the charge conference, Justice Wittner informed counsel that under the New York Court of Appeals decision in People v. McLaughlin, "the question of the territorial jurisdiction has to be raised or as the Court [of Appeals] says, 'put in issue in front of the jury.' My interpretation would be that . . . something has to be raised about it and then I give it. So far in this case no one has raised anything about territorial jurisdiction. . . .[U]nless the Defense either are putting on a case, brings something out in cross-examination, I don't believe I need to charge it." (Colloquy: Tr. 2543-45.) Carvajal's counsel replied that he would raise the issue during Cabbell's cross-examination. (Colloquy: Tr. 2545.)

Justice Wittner noted, however, that the individuals located in California were deemed to have acted in New York for jurisdictional purposes when they had phone conversations with individuals in New York. (Colloquy: Tr. 2546.) Justice Wittner stated that "[e]veryone of those conversations went through a cell cite within the geographical territory of the State of New York. How are you challenging the territorial jurisdiction of New York State to try these people?" (Colloquy: Tr. 2546.) Carvajal's counsel asked if Justice Wittner was talking about the possession charges, and Justice Wittner confirmed that she was. (Colloquy: Tr. 2547-49.) Carvajal's counsel responded that he did not "disagree" with Justice Wittner's analysis of New York law, and stated that "[o]bviously if you have two people talking, one in California, one in New York, each [state] is going to have jurisdiction." (Colloquy: Tr. 2550.)

Justice Wittner replied:

The People's allegations here are that – they're relying on 20.20 1-A and of course 20.61, that the element of the crime occurred in New York that is Freddy Lasso, Alvaro Carvajal and Louis Grueso constructively possessed the narcotics seized in California. That's as simple as I can get.

Through the evidence, they've shown that their ability to exercise dominion and control over the property in part occurred in the State of New York, thus giving New York State territorial jurisdiction ability to exercise jurisdiction over these three individuals. If it's not put in issue, according to McLaughlin, I don't charge it. I'm trying to get you to answer the question are you going to raise it as a jury question?"

(Colloquy: Tr. 2550.)

After defense summations and before the prosecutor's summation, Justice Wittner announced that "[d]efendants have requested the charge on territorial jurisdiction. . . . [B]ecause it was requested I will charge it." (Colloquy: Tr. 2882.) Justice Wittner proposed submitting

interrogatories for C.P.L. §§ 20.20(1)(a) and (c) for each of the three possession counts "which will conform to the People's theory of territorial jurisdiction. . . . I intend to charge it unless all 3 defense counsel [for Freddy Lasso, Grueso and Carvajal] withdraw their request. " (Colloquy: Tr. 2882.) Carvajal's counsel responded that "[w]e never asked for it." (Colloquy: Tr. 2882.) Grueso's counsel responded that he would "speak on behalf of all the defendants. We had a lengthy discussion this morning after your Honor gave us copies of the proposed charge with the interrogatories. After reviewing that with [co-defendants'] counsel and the defendants, the defendants have agreed to withdraw the request for territorial jurisdiction." (Colloquy: Tr. 2883.)

In charging the jury, Justice Wittner instructed that, to convict defendants of possession, the jury had to find that the defendants acting in concert constructively possessed the drugs in Queens and California. (Charge: Tr. 3087-95.) Justice Wittner also instructed that:

> [Y]ou should be aware that I have referred to many of the alleged overt acts as telephone conversations. The law in this regard says under Article 20.60 of the Criminal Procedure Law, "[a]n oral or written statement made by a person in one jurisdiction to a person in an another jurisdiction by means of telecommunications is deemed to be made in each such jurisdiction."

(Charge: Tr. 3082.)

**Verdict and Sentence**

On March 18, 1996, the jury convicted Carvajal of one count of second degree conspiracy and three counts of first degree criminal possession of a controlled substance. (Tr. 3139-42.)

On April 1, 1996, Carvajal was sentenced as a second felony offender to an aggregate of thirty-five years to life imprisonment: two concurrent twenty years to life terms on two possession counts, a concurrent twelve and one-half to twenty-five year term on the conspiracy count and a consecutive term of fifteen years to life on the third possession count. (See Dkt. No. 8: 4/1/96 Sentencing Transcript ["S."] at 26-28, 38-39.)[4/]

On January 12, 2007, Carvajal was re-sentenced, pursuant to the Rockefeller Drug Law Reform Act, to an aggregate term of twenty-six years imprisonment: two concurrent

---

[4/]    Co-defendant Freddy Lasso was convicted of one count of second degree conspiracy, three counts of first degree criminal possession of a controlled substance and one count of first degree criminal sale of a controlled substance, and sentenced to an aggregate of forty years to life imprisonment. (Tr. 3131-35; S. 22-24.) See also People v. Lasso-Reina, 305 A.D.2d 121, 121, 758 N.Y.S.2d 65, 65 (1st Dep't), appeal denied, 100 N.Y.2d 595, 766 N.Y.S.2d 171 (2003). Co-defendant Raul Lasso was convicted of first degree criminal sale of a controlled substance and second degree conspiracy, and sentenced to fifteen years to life. (Tr. 3142-44; S. 19.) See also People v. Lasso, 268 A.D.2d 313, 313, 701 N.Y.S.2d 391, 392 (1st Dep't), appeal denied, 94 N.Y.2d 922, 708 N.Y.S.2d 361 (2000). Co-defendant Louis Grueso was convicted of three counts of first degree criminal possession of a controlled substance and one count of second degree conspiracy, and sentenced to an aggregate of thirty-five years to life imprisonment. (Tr. 3137-39; S. 21-22.) See also People v. Camacho, 262 A.D.2d 238, 238, 690 N.Y.S.2d 454, 454 (1st Dep't), appeal denied, 93 N.Y.2d 1015, 697 N.Y.S.2d 574 (1999).

Carvajal's co-defendants' convictions were upheld on appeal. See cases cited above in this footnote.

determinate thirteen year terms on two possession counts, a concurrent term of twelve and one-half to twenty-five years on the conspiracy count and a consecutive term of thirteen years on the third possession count. (See Dkt. No. 9: Litsky Aff. Ex. S: Carvajal 1st Dep't Resentence Appeal Br. at 2; Dkt. No. 10: State Br. at 1 & n.1.)

**Carvajal's Direct Appeal to the First Department**

Represented by new counsel, Carvajal's appeal to the First Department claimed <u>inter alia</u> that: (1) "New York did not have territorial jurisdiction over the three possession counts which occurred entirely in California; defense counsel was ineffective in waiving this issue; the issue of territorial jurisdiction is non-waivable and should have been submitted to the jury" (Dkt. No. 9: Litsky Aff. Ex. D: Carvajal 1st Dep't Br. at 25-39); (2) "[t]estimony from an investigator providing his subjective interpretation of the meaning of telephone conversations impermissibly intruded upon the jury's ultimate fact-finding responsibility" (<u>id</u>. at 39-47); (3) Carvajal's counsel was ineffective for attempting to raise the "minimization" issue through the jury charge rather than through pre-trial litigation, failing to move to suppress physical evidence and failing to hire experts to prepare the defense's own translations of the wire-tapped conversations (<u>id</u>. at 47-54); (4) "the court below denied defendant his right to counsel of choice" (<u>id</u>. at 47, 54-55); (5) "[e]vidence concerning the recovery of $400,000 totally unrelated to the conspiracy with which defendant was charged should not have been admitted; since it was admitted, the jury should have been instructed on multiple conspiracies" (<u>id</u>. at 55-61); and (6) "[a]n adverse inference instruction was required where notes concerning intercepted conversations were destroyed; defense counsel was ineffective in not asking for any sanction" (<u>id</u>. at 61-64).

On December 9, 2004, the First Department unanimously affirmed Carvajal's conviction and sentence. People v. Carvajal, 14 A.D.3d 165, 786 N.Y.S.2d 450 (1st Dep't 2004). The First Department noted that "[t]erritorial jurisdiction 'goes to the very essence of the State's power to prosecute' and therefore may never be waived and must be proved beyond a reasonable doubt." People v. Carvajal, 14 A.D.3d at 168 , 86 N.Y.S.2d at 453. The First Department held that the trial court's exercise of jurisdiction over the possession counts was proper pursuant to C.P.L. § 20.20(1)(a), which states that "'a person may be convicted in the criminal courts of this state of an offense defined by the laws of this state, committed either by his own conduct or by the conduct of another for which he is legally accountable pursuant to section 20.00 of the penal law, when: 1. Conduct occurred within this state sufficient to establish: (a) An element of such offense; . . . .'" People v. Carvajal, 14 A.D.3d at 168, 86 N.Y.S.2d at 453 (quoting C.P.L. § 20.20(1)(a)). The First Department noted, however, that it was "aware of no other case in which a defendant was convicted of possession of a controlled substance when neither the drugs at issue nor the defendant was in New York at the time of the offense." People v. Carvajal, 14 A.D.3d at 170, 86 N.Y.S.2d at 454.

The First Department distinguished Carvajal's case from People v. Kassebaum, 95 N.Y.2d 611, 721 N.Y.S.2d 866 (2001), where the "Court of Appeals upheld the conviction of the defendant for attempted possession of narcotics that were located in Massachusetts," because "there is an important distinction between attempted possession and possession. . . . [T]he defendant in Kassebaum had engaged in conduct in New York that manifested an intent to obtain heroin and return with it to New York, the People successfully established that an element of the crime had

occurred in this state." <u>People</u> v. <u>Carvajal</u>, 14 A.D.3d at 170, 86 N.Y.S.2d at 454. Nevertheless,

"despite the absence of a prior similar case," the First Department held:

> [W]e conclude that neither defendant's being situated in California, nor the drugs at issue having ultimately been seized in California, prevents his prosecution in New York for possession of those drugs. The evidence amply supports the People's claim that an element of the crime occurred in this state.
>
> The elements of this crime are merely the knowing and unlawful possession of four or more ounces of a narcotic drug (<u>see</u> Penal Law § 220.21 [1]). Such possession may be physical, or it may be constructive (<u>see</u> CJI2d[NY] Penal Law § 220.21 [1]). The concept of constructive possession permits a conviction of possession upon a showing that although the defendant did not have physical possession, he exercised dominion and control over the contraband (<u>see</u> Penal Law § 10.00 [8]). The defendant may physically be elsewhere, separate from the drugs, as long as he exercised dominion and control over the locations where the subject drugs were discovered or over the subordinates who were physically in possession of the drugs.
>
> A defendant may even be in another jurisdiction. . . .
>
> Here, . . . there was ample evidence that regardless of where he was situated, defendant at all times exercised continued dominion and control over the drugs that were ultimately seized and the locations where the subject drugs were discovered, as well as over the employees who were found in possession of the drugs. Evidence demonstrated that defendant used telephone calls with Freddy Lasso in New York, and with others, to exercise a substantial degree of control over where and how the drugs that were ultimately seized would be located and transported. For example, intercepted telephone conversations in which defendant participated shortly after the raid on the "stash house" established that he was ultimately in charge of that location, from which 23 kilograms of cocaine were seized on June 15, 1994. Similarly, in an intercepted telephone conversation on May 17, 1994, defendant told Freddy Lasso that he would put 21 kilograms of cocaine in the white Mazda; on May 19, 1994, the white Mazda was searched and 21 kilograms of cocaine was found hidden inside. Also on May 19, 1994, defendant and Freddy Lasso had discussed a blue Volvo that defendant had arranged to be loaded with cocaine and picked up, which car the police also seized that night and in which they found 30 kilograms of cocaine.
>
> Furthermore, defendant may be deemed to have been physically in New York while he exercised continued dominion and control over the drugs that were

ultimately seized. Pursuant to CPL 20.60 (1), a statement made over the telephone by a person situated in one jurisdiction to a person in another jurisdiction is deemed to have been made in both jurisdictions. Consequently, during every interstate telephone discussion between defendant and Freddy Lasso regarding the drugs that were ultimately the subject of the challenged charges, defendant is deemed to have been in New York for jurisdictional purposes. The evidence therefore supports the conclusion that in the course of telephone conversations during which defendant is deemed to have been located in New York, he, Freddy Lasso and others, knowingly intended to and did exercise constructive possession over the drugs with which he is charged. Accordingly, there is ample evidence that defendant engaged in conduct in New York constituting an element of the drug possession charges. . . .

People v. Carvajal, 14 A.D.3d at 170-71, 86 N.Y.S.2d at 454-55 (citations omitted).

The First Department turned to Carvajal's claim that counsel's withdrawal of the claim that New York lacked territorial jurisdiction "amounted to an impermissible waiver of the issue of territorial jurisdiction." People v. Carvajal, 14 A.D.3d at 172, 86 N.Y.S.2d at 456. The First Department noted that:

Prior to charging the jury, the trial court discussed with counsel the rule that territorial jurisdiction must be proved beyond a reasonable doubt and cannot be waived. In order to carry out its obligation, the trial court addressed exactly how the jury would be charged on the subject with respect to the possession counts. At that point, each defendant's attorney specifically withdrew any request that the jury be charged on the issue of territorial jurisdiction.

People v. Carvajal, 14 A.D.3d at 172, 86 N.Y.S.2d at 456. The First Department held that counsel's conduct did not constitute ineffective assistance:

[O]nly when the State's right to prosecute is disputed must territorial jurisdiction be proved to the jury beyond a reasonable doubt, just like the elements of the crime itself. In the present case, defense counsel made a considered decision not to submit the issue to the jury, thereby simply removing the issue of territorial jurisdiction from the dispute. This decision on the part of the defendants' attorneys is the equivalent of a stipulation to a fact that the People would otherwise have to prove beyond a reasonable doubt.

To the extent defendant implies that the court has no authority to omit the territorial jurisdiction charge even if counsel requests its omission based upon an assessment of the evidence, defendant's own position on appeal contradicts the claim. Notably, on appeal, defendant does not take issue with the lack of a jury charge on territorial jurisdiction with regard to the conspiracy count. From this it may be inferred that the obligation to charge the jury on territorial jurisdiction does not arise when the defendant concedes--as he does with the conspiracy charge--that the evidence supporting the assertion of territorial jurisdiction was sufficient on that charge. Consequently, not even defendant can logically argue that the remark in McLaughlin about nonwaivability requires the court to charge the jury on the territorial jurisdiction issue even if the defendant concedes that the evidence on that issue is sufficient and stipulates that the issue should not be given to the jury.

Nor may defendant successfully establish his claim of ineffective counsel based upon counsel's decision to withdraw the territorial jurisdiction issue from the jury's consideration, in view of our conclusion that the evidence fully established jurisdiction pursuant to CPL 20.20 (1) (a).

People v. Carvajal, 14 A.D.3d at 172-73, 86 N.Y.S.2d at 456-57 (citation omitted).

The First Department further held that Carvajal's remaining appeal issues were "unpreserved and do not avail defendant." People v. Carvajal, 14 A.D.3d at 173, 86 N.Y.S.2d at 457.

The use of police officers as experts to explain the coded language of the intercepted telephone calls was proper. While the officer went on to give his opinion as to what the participants were doing in the activities described in the coded language, no objection was made by defendant to the questions posed or the answers supplied, and any objection to the error is, accordingly, unpreserved, and we decline to review it in the interest of justice. In any event, to the extent there was any error in the extent of the officer's expert testimony, it was minor and harmless.

People v. Carvajal, 14 A.D.3d at 173, 86 N.Y.S.2d at 457 (citations omitted).

The First Department noted that since "the remainder of defendant's ineffective assistance claim largely involves matters of trial counsel's strategy and preparation, it cannot be reviewed on this record." People v. Carvajal, 14 A.D.3d at 173-74, 86 N.Y.S.2d at 457. The First Department also ruled that Carvajal's claim that he was deprived of his right to counsel of choice

"rests entirely on factual assertions outside the record and is thus unreviewable." <u>People</u> v. <u>Carvajal</u>, 14 A.D.3d at 174, 86 N.Y.S.2d at 457.

> On the existing record, defendant has failed to show "the absence of strategic or other legitimate explanations" for the various aspects of counsel's conduct that are challenged on appeal, and on the present record we find that defendant received effective assistance. While defendant faults his trial counsel for failing to make an assortment of motions, applications and objections, he has not shown that any of these devices would have succeeded, or that the absence of those actions had any adverse impact on his defense.

<u>People</u> v. <u>Carvajal</u>, 14 A.D.3d at 174, 86 N.Y.S.2d at 457 (citations omitted).

## Carvajal's Appeal to the New York Court of Appeals

In December 2004, Carvajal's counsel submitted two leave letters to the New York Court of Appeals seeking to present two issues: (1) "Whether New York did not have territorial jurisdiction over the three possession counts which occurred entirely in California? Whether defense counsel was ineffective in waiving this issue? Whether the issue of territorial jurisdiction is non-waivable and should have been submitted to the jury?" and (2) "Whether [Carvajal]'s counsel was ineffective where the record reflects an utter lack of preparation in a complex case involving hundreds of hours of wiretapped conversation?" (Dkt. No. 13: 12/19/04 & 12/24/04 Carvajal Ct.

App. Leave Letters.)[5/]  Carvajal's second leave letter specifically declined to raise the other issues included in the direct appeal.  (12/24/04 Carvajal Ct. App. Leave Letter at 5-6 n.2.)

On January 31, 2005, the New York Court of Appeals granted Carvajal leave to appeal.  People v. Carvajal, 4 N.Y.3d 762, 792 N.Y.S.2d 6 (2005).

Carvajal's brief to the New York Court of Appeals argued that:  (1) "New York lacked territorial jurisdiction for the three possession counts where both [Carvajal] and the drugs were located in California; defense counsel was ineffective in waiving this issue; the issue of territorial jurisdiction is non-waivable and should have been submitted to the jury" (Dkt. No. 9: Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 21-50); and (2) Carvajal's trial counsel was ineffective for attempting to raise the "minimization" issue through the jury charge instead of before trial (id. at 52-54), failing to move to suppress physical evidence (id. at 54-55), failing to hire experts to translate and prepare the transcripts of the wire-tapped conversations (id. at 55-56), and failing to challenge Carvajal's adjudication as a second felony offender (id. at 56-58).

On November 22, 2005, the Court of Appeals affirmed Carvajal's conviction and sentence.  People v. Carvajal, 6 N.Y.3d 305, 812 N.Y.S.2d 395 (2005).  The Court of Appeals first noted that by counsel failing to move for a trial order of dismissal based on the People's failure to prove jurisdiction and by counsel rejecting Justice Wittner's "offer to place the [jurisdictional]

---

[5/]  Assistant Attorney General Thomas Litsky's affidavit in response to Carvajal's petition stated that "[t]he District Attorney's Office could not locate petitioner's application for leave to appeal, and the New York Court of Appeals was unable to provide respondent with a copy of the leave application.  Should we obtain a copy of this application, it will be forwarded to the Court."  (Dkt. No. 9: Litsky Aff. at 2 n.1.)  My law clerk called the Court of Appeals, and within an hour received, via facsimile, Carvajal's leave application.  Mr. Litsky must be too busy to make a personal phone call to the Court of Appeals.

interrogatories before the jury," Carvajal "relinquished his opportunity to hold the People to their burden of proof, and did not preserve his current contention that the jury should have decided whether the People proved jurisdiction beyond a reasonable doubt." People v. Carvajal, 6 N.Y.3d at 311-12, 812 N.Y.S.2d at 399. Nevertheless, the Court of Appeals held that "although a defendant's failure to request a jury charge on territorial jurisdiction amounts to waiver of a jury charge claim, that failure does not amount to waiver of the fundamental question whether – as a matter of law – this State has the power to hear the case. Indeed, territorial jurisdiction implicates the State's inherent authority to prosecute and punish a suspect for alleged criminal conduct, . . . ." People v. Carvajal, 6 N.Y.3d at 312, 812 N.Y.S.2d at 399.

The Court of Appeals, "[w]ithout reaching CPL 20.20(1)(a)," held that "pursuant to the authority granted by CPL 20.20(1)(c), New York was vested with jurisdiction to prosecute." People v. Carvajal, 6 N.Y.3d at 307, 313, 812 N.Y.S.2d at 396, 400. C.P.L. § 20.20(1)(c) provides that:

> "a person may be convicted in the criminal courts of this state of an offense defined by the laws of this state, committed either by his own conduct or by the conduct of another for which he is legally accountable . . . , when: 1. Conduct occurred within this state sufficient to establish: . . . (c) A conspiracy or criminal solicitation to commit such offense, or otherwise to establish the complicity of at least one of the persons liable therefor; provided that the jurisdiction accorded by this paragraph extends only to conviction of those persons whose conspiratorial or other conduct of complicity occurred within this state."

People v. Carvajal, 6 N.Y.3d at 313, 812 N.Y.S.2d at 400 (quoting C.P.L. § 20.20(1)(c)). The Court of Appeals highlighted that Carvajal conceded that New York possessed jurisdiction to prosecute him for conspiracy because "the conspiracy alleged was broader than the possession counts; in his

brief, [Carvajal] admits that the conspiracy as set forth in the indictment charged not only the possession, but the transportation of multiple kilograms of cocaine from the San Francisco, California area to New York City." People v. Carvajal, 6 N.Y.3d at 313-14, 812 N.Y.S.2d at 400 (internal quotations omitted).

The Court of Appeals concluded that:

Two facts make a clear case for jurisdiction to prosecute defendant under CPL 20.20(1)(c): first, defendant [Carvajal] was physically present in New York for some of the conspiratorial conduct on which jurisdiction is predicated; and second, the drugs in question were to be shipped to New York. Defendant [Carvajal] flew to New York in May, and while in this state, he made out-of-state phone calls to underlings, met with New York cohorts and conspired to transport cocaine here.

Defendant contends that his telephone calls from California to New York counterparts amount merely to conduct having some "nexus" to this state, not conduct occurring within this state. However, under CPL 20.60(1), defendant's telephonic statements to his accomplices here are deemed to be New York conduct. In those calls, he spoke with Freddy Lasso and others concerning their joint efforts to move drugs from California to New York.

Defendant had conspiratorial telephone conversations with Freddy Lasso concerning the 21 kilograms of cocaine recovered on May 19 from the white Mazda. They discussed the fact that these drugs had been removed from a stash house, that the white car was ready for Hans Vargas to pick up, that police had searched Vargas's car and that Freddy Lasso directed Vargas to return to the car from the airport terminal. Defendant and Freddy Lasso also engaged in several telephone conversations regarding the 30 kilograms of cocaine seized from the blue Volvo on May 19. Defendant told Lasso that these drugs had been removed from a stash house and that he was waiting for Victor Hugo to park the car at the shopping center and leave the keys so that the car could be picked up. Additionally, defendant arrived at the Daly City stash house on June 15, while agents were executing a search warrant and recovering 23 kilograms of cocaine and more than $433,000. The next day, defendant had several telephone conversations with Freddy Lasso and Grueso about the details of the police raid, defendant's narrow escape from the house, and the loss of the cocaine and cash.

Thus, while he was present in this state, both physically and by telephone defendant conspired with his accomplices and engaged in overt acts in furtherance of their possession of significant quantities of cocaine and their plan to transport the cocaine to New York.

People v. Carvajal, 6 N.Y.3d at 314-15, 812 N.Y.S.2d at 401-02 (citations omitted).

The Court of Appeals' majority next responded to the dissent. First, the majority emphasized that since it decided the issue based on C.P.L. § 20.20(1)(c), the "principles of judicial restraint" dictated that it need not decide whether "jurisdiction might also be established under CPL 20.20(1)(a) or any other theory." People v. Carvajal, 6 N.Y.3d at 316, 812 N.Y.S.2d at 402.

The Court of Appeals majority additionally noted that "the dissent concludes that despite CPL 20.60(1), defendant's telephone calls to New York did not establish an element of possession here. Again, the interstate calls to New York, deemed to have occurred here by statute, aid in establishing jurisdiction over the conspiracy to commit the possessory offense here." People v. Carvajal, 6 N.Y.3d at 316 n.8, 812 N.Y.S.2d at 402 n.8.

The Court of Appeals also highlighted that:

[A]t trial, defendant never alleged any constitutional violation, federal or state, concerning his prosecution by New York. Defendant's references in his brief to article I, § 2 of the New York State Constitution are offered in support of his claim that "New York courts have given the jurisdictional exceptions in Criminal Procedure Law Article 20 'a restrictive interpretation and operation.'" Nowhere in his brief does defendant contend that, on a constitutional ground, the Legislature lacked the power to vest jurisdiction in the manner it has chosen.

People v. Carvajal, 6 N.Y.3d at 316, 812 N.Y.S.2d at 402-03 (citation & internal quotations omitted).

Finally, the Court of Appeals responded to the dissent's argument that the majority's holding was only correct if the possession offense was actually committed in New York by stating

that "[t]he Legislature, however, concluded otherwise. In this coast-to-coast drug trafficking operation, defendant [Carvajal] conspired in New York with his New York cohorts to bring cocaine to New York, thus affording a basis for the assertion of jurisdiction under our statutory scheme to prosecute him, jointly with his coconspirators, here." People v. Carvajal, 6 N.Y.3d at 317, 812 N.Y.S.2d at 403.

The Court of Appeals addressed Carvajal's ineffective assistance of counsel claim by merely stating that it "lacks merit." People v. Carvajal, 6 N.Y.3d at 317, 812 N.Y.S.2d at 403.

Judge George Bundy Smith dissented, arguing that even though Carvajal was properly convicted of conspiracy and could have been properly prosecuted for attempted possession of a controlled substance, Carvajal's possession of a controlled substance conviction violated the federal and state constitutions and New York law. People v. Carvajal, 6 N.Y.3d at 317, 812 N.Y.S.2d at 403 (dissent). "[T]he Constitution of the United States, the Constitution of the State of New York and the laws of the State of New York do not permit a person to be found guilty of criminal possession of a controlled substance on a theory of constructive possession rather than actual possession where both the substance and the defendant are in California." People v. Carvajal, 6 N.Y.3d at 317, 812 N.Y.S.2d at 403 (dissent). Judge Smith's dissent argued that "[t]o begin with, the conviction of defendant [Carvajal] for constructive possession here violates article III, § 2 of the Federal Constitution, which reads in part: '[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed,'" and the Sixth Amendment, "which reads in part: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.'" People v. Carvajal, 6

N.Y.3d at 321-22, 812 N.Y.S.2d at 406 (dissent). Judge Smith's dissent further maintained that the conviction violated article I, § 2 of the New York Constitution, "encompass[ing] the right to be tried in the county where the crime occurred." People v. Carvajal, 6 N.Y.3d at 322, 812 N.Y.S.2d at 406 (dissent).

Judge Smith's dissent turned to analyzing the trial court's exercise of jurisdiction pursuant to C.P.L. § 20.20(1)(a). People v. Carvajal, 6 N.Y.3d at 323, 812 N.Y.S.2d at 407 (dissent). The dissent concluded that:

> The elements of criminal possession of a controlled substance are the knowing and unlawful possession of four or more ounces of a controlled substance within the State of New York. Neither the defendant nor the drugs were present in New York at the time of defendant's apprehension. As a result of the lack of obvious jurisdiction, New York has encroached upon California's jurisdiction.
>
> "The general rule in New York is that, for the State to have criminal jurisdiction, either the alleged conduct or some consequence of it must have occurred within the State."
>
> "Jurisdiction in this sense is a question of the sovereign's power to prosecute and punish an accused for conduct which is allegedly criminal. Because the State only has power to enact and enforce criminal laws within its territorial borders, there can be no criminal offense unless it has territorial jurisdiction."
>
> . . . .
>
> Territorial jurisdiction over conspiracy was established. That issue is not disputed in this case. Territorial jurisdiction was not established over criminal possession of a controlled substance when the substance never reached New York or the hands of the defendant in New York or a person or area in New York that defendant exercised dominion or control over. . . . [I]n this case, we have two separate crimes, conspiracy and criminal possession of a controlled substance, in which New York must establish territorial jurisdiction.

People v. Carvajal, 6 N.Y.3d at 323-24, 812 N.Y.S.2d at 407-08 (dissent; citations omitted). The dissent maintained that, although the majority refused to consider C.P.L. § 20.20(1)(a) and the applicability of People v. Kassebaum, 95 N.Y.2d 611, 721 N.Y.S.2d 866 (2001), the trial court and the prosecution on appeal relied upon that section and case, and, thus, C.P.L. § 20.20(1)(a) should not be "remove[d]" from the case. People v. Carvajal, 6 N.Y.3d at 324, 812 N.Y.S.2d at 408 (dissent). Judge Smith stated:

> To uphold a conviction for criminal possession of a controlled substance based upon constructive possession of drugs found in California where the defendant was also located in California would be an extension of this Court's decision in People v. Kassebaum [95 N.Y.2d 611, 721 N.Y.S.2d 866 (2001)]. In that case, defendant, whose role was to test the purity of the heroin sought to be brought to New York, met with the leader of the conspiracy in Brooklyn, New York. Subsequently, defendant was arrested in Massachusetts and convicted in New York for conspiracy in the second degree and attempted criminal possession of a controlled substance in the first degree based upon the conduct of an accomplice (the leader of the conspiracy) in New York in collecting money for the sale of drugs, making travel arrangements for defendant and directing the activities of defendant in Massachusetts. This Court noted in Kassebaum that the "issue under CPL 20.20(1)(a) is whether the People established that defendant and his accomplices engaged in conduct within New York sufficient to establish an element of attempted criminal possession of a controlled substance as required by the statute." We stated:

>> "Defendant's reliance on Cullen [People v. Cullen, 50 N.Y.2d 168 [, 428 N.Y.S.2d 456] (1980)] is misplaced because none of the individuals held criminally accountable in Cullen were present in the prosecuting jurisdiction when the offense was consummated. . . . This holding does not necessarily apply to an attempt offense which requires proof of a different mens rea-the intent to accomplish a criminal objective. Here, proof was offered that defendants engaged in substantial conduct in New York that manifested an intent to obtain heroin and return with it to New York. Standing alone, this conduct did not rise to a level sufficient to support criminal prosecution for attempted possession of a controlled substance because defendants' conduct did not constitute an attempt until the meeting in the Boston hotel room when defendants' conduct came 'dangerously near' criminal possession of heroin. Nonetheless, the conduct committed in New York evidenced defendant's

intent sufficiently to establish the jurisdictional predicate underlying the prosecution under the CPL 20.20(1)(a) element requirement."

Thus, <u>Kassebaum</u> permitted the prosecution and conviction in this state of an attempt to commit the crime of criminal possession of a controlled substance, not the completed crime of criminal possession.

<u>People</u> v. <u>Carvajal</u>, 6 N.Y.3d at 324-26, 812 N.Y.S.2d at 408-09 (dissent).

Judge Smith's dissent also rebutted the majority's holding that jurisdiction was proper

pursuant to C.P.L. § 20.20(1)(c).  <u>People</u> v. <u>Carvajal</u>, 6 N.Y.3d at 326-27, 812 N.Y.S.2d at 409-10

(dissent).

Nothing in the language of CPL 20.20(1)(c) supports [the majority's] interpretation. Moreover, the fact that the crime of criminal possession of a controlled substance was never completed here (the drugs and the defendant were in California at the time that the drugs were seized) necessarily prevents New York from exercising jurisdiction over the crime of criminal possession of a controlled substance pursuant to CPL 20.20(1)(c). Here, Supreme Court tried defendant for criminal possession of a controlled substance, a crime that was never committed in New York. No previous case has held, as the majority does, that a criminal court can exercise jurisdiction over a crime that never actually occurred in New York.

Relying on a constructive possession theory, the People argued that defendant committed three counts of criminal possession of a controlled substance in the first degree. . . .

It is clear that no New York trial court could acquire jurisdiction over the three counts of criminal possession because no such crime occurred in New York. In order for criminal possession of a controlled substance, based on a theory of constructive possession, to occur, defendant had to exercise dominion or control over (1) an area, located in New York, where controlled substances, weighing four ounces or more, were found, or (2) a person, located in New York and actually in possession of controlled substances weighing four ounces or more, from whom the controlled substances were seized. Defendant never exercised that sort of dominion or control. The controlled substances at issue were seized in California, not New York, from persons who were in California. Moreover, at the time of the seizure, defendant was in California. Put another way, the crime of criminal possession of a controlled

substance never occurred in the State of New York. As such, no such offense occurred. Therefore, no jurisdiction over the crime can be exercised.

People v. Carvajal, 6 N.Y.3d at 327-28, 812 N.Y.S.2d at 410-11 (dissent) (citations omitted).

The dissent further claimed that the majority's " reliance on CPL 20.60(1) . . . [was] inappropriate . . . [because] CPL 20.60(1) applies only to crimes that do not require defendant to be physically present within New York in order to commit the crime. Here, the criminal possession counts require knowing and unlawful possession of controlled substances in New York." People v. Carvajal, 6 N.Y.3d at 329, 812 N.Y.S.2d at 411-12 (dissent) (fn. omitted)

Judge Smith's dissent concluded by stating that:

> In summary, the controlled substances at issue were seized from persons and a house located in California, not recovered from an area or person located in New York. These drugs were never possessed in New York by defendant. Nor were they possessed within an area or by a person under defendant's dominion and control. Accordingly, the crime of criminal possession of a controlled substance never occurred within the territorial borders of New York. Thus, the trial court could not acquire jurisdiction over the crime.

People v. Carvajal, 6 N.Y.3d at 330, 812 N.Y.S.2d at 412 (dissent).

## Carvajal's C.P.L. § 440 Motion

On February 11, 2006, Carvajal filed a pro se C.P.L. § 440.10 motion to vacate the judgment. (See Dkt. No. 9: Litsky Aff. Ex. L: Carvajal 440 Motion.) Carvajal argued that: (1) the "trial court deprived [Carvajal] of the right to counsel of his choice" (Carvajal 440 Motion Br. at Point I); (2) the "trial court's refusal to consider [Carvajal]'s pro se pre trial motions was reversible error where . . . the motions were meritorious and designed to compensate for appointed counsel's failure to conduct discovery and submit appropriate pretrial motions" (id. Point II); and (3) trial

counsel was ineffective for failure to "under take an adequate investigation . . . , apply the legal standing of the individuals responsible for monitoring, translating and transcription of wiretap evidence, make suppression motions relative to investigated materials, and to make appropriate objections to preserve issues for appellate review . . . ." (id. Point III).

The State responded that Carvajal's ineffective assistance of counsel claims were procedurally barred under C.P.L. § 440.10(2)(a) and (c) because the Court of Appeals determined the majority of Carvajal's claims on the merits and Carvajal unjustifiably failed to raise the remaining claims in his direct appeal. (Litsky Aff. Ex. M: State 440 Motion Opp. Br. at 3-5.)

In the alternative, the State argued that the evidence was overwhelming and that defense counsel zealously advocated for Carvajal by filing written motions, focusing on the weaknesses in the prosecution's case during opening statements, heavily cross-examining the prosecution witnesses and attacking Cabbell's credibility and the lack of physical evidence during summations. (State 440 Motion Opp. Br. at 5-10.) The State also disputed Carvajal's claim that counsel's motions consisted of "boilerplate" by noting that defense counsel's motion included requests for detailed discovery, dismissal of the indictment based on insufficiency of the grand jury minutes, inspection of the grand jury minutes and Sandoval and Huntley hearings. (State 440 Motion Opp. Br. at 7, 10-12.) The State argued that Carvajal's claim that counsel was ineffective for failing to move to suppress evidence was meritless because "[a]n attorney has no obligation to make a suppression motion that is meritless or unlikely to succeed" and noted that Freddy Lasso's and Grueso's motions to suppress wiretap and physical evidence were denied. (State 440 Motion Opp. Br. at 11-12.)

The State attacked Carvajal's claim that counsel should have raised the qualifications of the monitors and minimization before the court by pointing to counsel's "attempts to suggest to the jurors that the investigation was flawed by employment of non-law enforcement personnel to make major decisions regarding intrusive eavesdropping procedures." (State 440 Motion Opp. Br. at 12-13.) The State further argued that, even though the trial court reminded counsel that minimization was an issue for the court, no legal basis existed for the motions. (See State 440 Motion Opp. Br. at 13.) The State contended that counsel may have raised the issue before the jury because defense counsel believed he could persuade jurors that the government had trampled on Carvajal's rights. (State 440 Motion Opp. Br. at 14.)

The State also countered Carvajal's claim that his counsel was ineffective for failure to hire an expert to translate the intercepted phone calls by arguing that "there was no hint that the transcripts were not accurately prepared," particularly in light of the presence of Carvajal, a native Spanish speaker, at the trial. (State 440 Motion Opp. Br. at 13-14.)

The State also argued that Carvajal was not denied his right to counsel of choice. (See State 440 Motion Opp. Br. at 15-17.) The State noted that Carvajal "has failed completely to provide record support for his assertions that the court relieved retained counsel in defendant's absence, that defendant was not advised he could retain a second lawyer, that he did not know that he could not retain a second lawyer on his own, and that he forfeited his retainer as a result of the court's action." (State 440 Motion Opp. Br. at 17.)

On November 30, 2006, Justice Bonnie Wittner denied Carvajal's motion "pursuant to CPL. 440.10(2) and for the substantive reasons set forth in the People's opposing papers." (Litsky

Aff. Ex. N: Justice Wittner 440.10 Decision.)  On February 13, 2007, the First Department denied

leave to appeal from Justice Wittner's denial of Carvajal's C.P.L. § 440.10 motion.  (Litsky Aff. Ex.

R: 2/13/07 1st Dep't Order.)  See People v. Carvajal, No. M-7003, 2007 N.Y. App. Div. Lexis 1862

(1st Dep't Feb. 13, 2007).[6/]

---

[6/]    Carvajal also filed a pro se C.P.L. § 440.20 motion to vacate or reduce his sentence based on
the Rockefeller Drug Law Reform Act.  (Dkt. No. 16:  Litsky 6/20/08 Supp. Aff. Ex. F:
Carvajal Motion to Vacate Sentence ["Carvajal 440.20 Motion"] at 1; Ex. G: Duncan Supp.
Aff. to Carvajal 440.20 Motion at 2-3.)

On January 12, 2007, pursuant to the Rockefeller Drug Law Reform Act, Justice
Wittner reduced Carvajal's sentence to thirteen years on each of the possession counts, with
two of the possession count sentences to run concurrent to each other and to the conspiracy
count, and the third possession count sentence to run consecutive to the other sentences, for
a total sentence of twenty-six years. (Litsky 6/20/08 Supp. Aff. Ex. J: Justice Wittner 440.20
Decision at 3.)  Carvajal appealed to the First Department, seeking concurrent terms at the
new statutory minimum.  (Dkt. No. 9: Litsky Aff. Ex. S: Carvajal 1st Dep't Sentence App.
Br.)  The First Department has not yet decided whether to further reduce Carvajal's sentence.

On February 14, 2007, Carvajal applied to the First Department for a writ of error
coram nobis on the grounds that his appellate counsel's delay in filing the brief to the First
Department was unjustifiable and the First Department violated Carvajal's constitutional
rights by consenting to appellate counsel's requests for extensions.  (Dkt. No. 16:  Litsky
6/20/08 Supp. Aff. Ex. A: Carvajal Coram Nobis Pet. at 1, 4-6.)

On May 29, 2007, the First Department denied Carvajal's coram nobis petition
without opinion.  (Litsky 6/20/08 Supp. Aff. Ex. C: 5/29/07 1st Dep't Order.)  See People v.
Carvajal, 2007 N.Y. Slip Op. 70266(U), 2007 N.Y. App. Div. LEXIS 6585 (1st Dep't
May 29, 2007).  On September 7, 2007, the New York Court of Appeals denied leave to
appeal.  (Litsky 6/20/08 Supp. Aff. Ex. E: 9/7/07 N.Y. Ct. App. Order.)

Neither the sentencing issue nor the coram nobis claims are involved in this habeas
petition.

**Carvajal's Federal Habeas Corpus Petition**

Carvajal's habeas corpus petition asserts that: (1) the trial court lacked territorial jurisdiction over the three drug possession counts (Dkt. No. 1: Pet. at 31-37); (2) trial counsel was ineffective for failing to: (a) "object to, withdrawal from consideration by the jury, and consequential waiver of the 'territorial jurisdiction' issue from the case"; (b) raise the "minimization" issue before trial; (c) file motions to suppress evidence; (d) hire a translator to interpret the wiretap evidence; (e) call witnesses; (f) question wiretap transcribers before trial; and (g) object to the monitors' oaths not being turned over prior to trial (Pet. at 32-33, 37, 43; Dkt. No. 9: Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 52-54; Carvajal Aff. Ex. L: Carvajal 440 Motion Aff. at Points III & VIII); (3) Carvajal was deprived of his right to counsel of his choice (Pet. at 37-42, 44-45); (4) the trial court lacked jurisdiction over Carvajal because a grand jury failed to indict him, since only the superceding indictment, not the original indictment, had Carvajal's name in the caption (Pet. at 44); and (5) the trial court's "refusal to consider [Carvajal]'s pro se pre-trial motions was reversible error where . . . the motions were meritorious and designed to compensate for appointed counsel's failure to conduct discovery and submit appropriate pretrial motions" (Carvajal 440 Motion Br. at Point II).

## ANALYSIS

I.    **THE AEDPA REVIEW STANDARD**

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[7/]

---

[7/]    See also, e.g., Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[8/] Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[9/] "That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v.

---

[8/]    Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[9/]    Accord, e.g., Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed]' clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); Rodriguez v. Miller, 499 F.3d 136, 140 (2d Cir. 2007) ("'Clearly established federal law' refers only to the holdings of the Supreme Court. No principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief. Leading by example, Musladin admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions.") (citations & fn. omitted), cert. denied, 128 S. Ct. 1655 (2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171 (2004); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Yung v. Walker, 341 F.3d 104, 109-110 (2d Cir. 2003); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir.), petition for cert. filed, -- U.S.L.W. -- (Oct. 1, 2008). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., Rodriguez v. Miller, 499 F.3d at 140; DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . . A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[10]/

In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. at 413, 120 S. Ct. at 1523.[11]/ However,

---

[10]/    Accord, e.g., Davis v. Grant, 532 F.3d at 140; Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 123 S. Ct. at 1173-74; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

[11]/    Accord, e.g., Brown v. Payton, 544 U.S. at 141, 125 S. Ct. at 1439; Wiggins v. Smith, 539 (continued...)

"[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id</u>.[12] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 409, 120 S. Ct. at 1521.[13] "Objectively unreasonable" is different from "clear error." <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

---

[11]    (...continued)
U.S. at 520, 123 S. Ct. at 2534-35; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[12]    <u>See also</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

[13]    <u>Accord</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520-21, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853; <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1174-75; <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. at 25-27, 123 S. Ct. at 360-61; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 519 (2d Cir. 2006), <u>cert. denied</u>, 128 S. Ct. 75 (2007); <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 125; <u>Ryan</u> v. <u>Miller</u>, 303 F.3d 231, 245 (2d Cir. 2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 128-29.

deference to state courts by conflating error (even clear error) with unreasonableness.").  However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" <u>Jones</u> v. <u>Stinson</u>, 229 F.3d at 119 (quoting <u>Francis S.</u> v. <u>Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000)).[14/]  "[T]he range of reasonable judgment can depend in part on the nature of the relevant rule." <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 663, 124 S. Ct. at 2149.[15/]  "Even if the state court issues a decision 'contrary to' clearly established Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" <u>Cousin</u> v. <u>Bennett</u>, 511 F.3d 334, 339 (2d Cir.), <u>cert. denied</u>, 128 S. Ct. 2910 (2008).

---

[14/]     Accord, <u>e.g.</u>, <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197, 200-01; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 125; <u>Ryan</u> v. <u>Miller</u>, 303 F.3d at 245; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 110; <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184.

[15/]     The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

<u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 663, 124 S. Ct. at 2149; <u>accord</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Miller</u>, 499 F.3d at 143; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243.

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[16]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates

---

[16]      Accord, e.g., Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'" "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254." Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference."); but cf. Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (A "contrary-to-fact construction is not the same as an alternative holding. . . . We decline to read a contingent observation as an 'adjudication on the merits.'" De novo review applies in such a case.).

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in Coleman, Quirama and Sellan" – that is, "(1) the face of the state-court opinion, (2) whether the state

court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances."

Jimenez v. Walker, 458 F.3d at 145 & n.16; accord, e.g., Clark v. Perez, 510 F.3d 382, 394 (2d Cir.),

cert. denied, 2008 WL 2336981 (Oct. 6, 2008). Using these three factors, the court should

classify the decision as either:

> (1)  fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)  fairly appearing to rest primarily on state procedural law.

Absent a clear and express statement of reliance on a state procedural bar, the Harris presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim. Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d). The Harris presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar. Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar. No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised. The middle ground . . . does not exist.

Jimenez v. Walker, 458 F.3d at 145-46 (citations & fns. omitted); accord, e.g., Hawkins v. Costello,

460 F.3d at 242 ("In Jimenez v. Walker, we recently made clear that when a state court rejects a

petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the

adjudication rested on the merits."). Of course, "[i]f there is no [state court] adjudication on the

merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies." Cotto

v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Jimenez v. Walker, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable

application of established law, resulting in constitutional error, it must next consider whether such

error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a

deferential review standard for state court factual determinations: "a determination of a factual issue

made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Lynn

v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The petitioner bears the burden

of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner,

337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Lynn v. Bliden, 443 F.3d at 246-47.

## II. THE NEW YORK COURT OF APPEALS' DETERMINATION THAT THE TRIAL COURT POSSESSED TERRITORIAL JURISDICTION OVER THE THREE CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE COUNTS WAS NOT AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT

Carvajal's habeas petition claims that the trial court lacked territorial jurisdiction over

the three possession of a controlled substance counts of which Carvajal was convicted.[17/] (Dkt. No.

1: Pet. at 31-37; see also Dkt. No. 14: Carvajal Traverse at Point II, pp. 5-6.)[18/]

---

[17/]   Carvajal never has claimed that the trial court did not possess jurisdiction over the conspiracy count. See People v. Carvajal, 6 N.Y.3d 305, 313-14, 812 N.Y.S.2d 395, 400 (2005).

[18/]   To the extent that Carvajal also claims that, because jurisdiction is non-waivable, Justice Wittner erred by not submitting the jurisdictional issue to the jury, that claim is barred by an adequate and independent state ground because the New York Court of Appeals held that
(continued...)

## A.    Supreme Court Precedent

### 1.    Strassheim v. Daily (1911) and It's Progeny

The Supreme Court first addressed in Strassheim v. Daily, 221 U.S. 280, 281-82, 31 S. Ct. 558, 559 (1911), whether a state could assert jurisdiction when a defendant committed the acts constituting the alleged crimes in another state.  In Strassheim, Michigan indicted Daily, an Illinois resident, for bribery based on Daily's having bribed a Michigan prison official to agree to a scheme to sell old machinery as if new to a Michigan prison.  Strassheim v. Daily, 221 U.S. at 281-82, 31 S. Ct. at 559.   Daily committed the acts constituting bribery in Chicago, Illinois, but was in Michigan later when the contract was "considered and accepted" and when the machinery was inspected.  Strassheim v. Daily, 221 U.S. at 283-84, 31 S. Ct. at 559-60.  The Supreme Court held:

> [T]he usage of the civilized world would warrant Michigan in punishing [Daily], although he never had set foot in the state until after the fraud was complete. Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.

---

18/    (...continued)

Carvajal failed to preserve the claim.  (See pages 27-28 above.)  See, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810-11 & n.4 (2d Cir. 2000) ("where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved"); Glenn v. Bartlett, 98 F.3d 721, 724-25 & n.3 (2d Cir. 1996) (state decision which denied claim as not preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interests of justice"), cert. denied, 520 U.S. 1108, 117 S. Ct. 1116 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (state decision which denied claims as procedurally barred but then alternatively addressed merits rested on adequate and independent state grounds); see generally King v. Greiner, 02 Civ. 5810, 2008 WL 4410109 at *28-29 (S.D.N.Y. Sept. 26, 2008) (Peck, M.J.).

<u>Strassheim</u> v. <u>Daily</u>, 221 U.S. at 284-85, 31 S. Ct. at 560.

The Eleventh Circuit relied on <u>Strassheim</u> in denying habeas relief to petitioners claiming that the state courts lacked jurisdiction because the petitioners committed the crime in another state. In <u>Buffo</u> v. <u>Graddick</u>, 742 F.2d 592, 594 (11th Cir. 1984), Alabama convicted the petitioner of aiding and abetting an Alabama corporation in securities fraud by falsely appraising California property in California, where the petitioner knew that the false appraisal would be used by the Alabama corporation in its capital statement. <u>Buffo</u> v. <u>Graddick</u>, 742 F.2d at 598. The Eleventh Circuit held that the petitioner "committed the act of submitting a false appraisal, knowing it would have effects in Alabama. The detrimental effects here, fraud resulting in harm to [the Alabama corporation]'s creditors, were within the power of the state to punish. Under these circumstances, <u>Strassheim</u> supports Alabama's exercise of jurisdiction over" petitioner. <u>Buffo</u> v. <u>Graddick</u>, 742 F.2d at 598.[19]

In <u>Heath</u> v. <u>Jones</u>, the Eleventh Circuit again relied on <u>Strassheim</u> to deny habeas relief to a petitioner who alleged that "his prosecution in Alabama for a murder in Georgia offend[ed] various due process concepts which limit the territorial reach of state criminal

---

[19] See also <u>Lynch</u> v. <u>Crosby</u>, No. 05CV38, 2006 WL 741555 at *20 (N.D. Fla. Mar. 20, 2006) (citing <u>Strassheim</u> and <u>Buffo</u> in holding that the state court did not "unreasonably appl[y] the relevant Supreme Court authority" in asserting jurisdiction based on Florida's criminal long-arm statute, which "reaches any person who commits an act that results in a criminal wrong in Florida," to convict petitioner of "conspir[ing] to defraud Escambia County, Florida, and shar[ing] in the resulting commissions, even though this petitioner did not himself have direct dealings with Escambia County").

prosecutions." Heath v. Jones, 941 F.2d 1126, 1138-39 (11th Cir. 1991), cert. denied, 502 U.S. 1077, 112 S. Ct. 981 (1992). In Heath, Alabama convicted the petitioner of murder during a kidnapping where the petitioner kidnapped the victim in Alabama, but murdered her in Georgia. Heath v. Jones, 941 F.2d at 1129. The Eleventh Circuit held that:

> The focus should be on Justice Holmes' opinion in Strassheim v. Daily, . . . , and its progeny. . . . The Court [in Strassheim] held that when an individual's criminal acts directly violate the peace, tranquility and laws of a state, the state may prosecute that individual, even if the individual commits the act in another jurisdiction. In the case at bar, a portion of the crime of kidnapping/murder occurred in Alabama. It is undisputed that this act directly violated the peace, tranquility, and laws of Alabama. Under Strassheim the state has established a sufficient nexus to satisfy any requirement of subject matter jurisdiction.

Heath v. Jones, 941 F.2d at 1139.[20/]

The First Circuit also relied on Strassheim in holding that:

> The potential effect on Massachusetts when one of its own legislators accepts gratuities out-of-state paid by someone with an interest in Massachusetts legislation is a sufficient nexus to satisfy the effects test and give Massachusetts jurisdiction to prohibit such conduct.
>
> Besides this potential effect, of course, [defendant's] receipt of gratuities in Florida was linked also to his official acts in Massachusetts. . . .
>
> [Defendant's] Florida gratuity was closely enough related to Massachusetts that his "effects doctrine" argument must fail.

---

[20/] See also Gore v. Crosby, No. 03-CV-474, 2006 WL 4847609 at *4, 25-27 (M.D. Fla. Jan. 31, 2006) (Florida's exercise of jurisdiction was not "contrary to" or an "unreasonable application" of Supreme Court precedent where the victim's dead body was found in Florida, even though the petitioner and the victim were only seen together in Tennessee. Citing Strassheim and Heath, the court held that jurisdiction was proper because petitioner's "acts directly violated the peace, tranquility and laws of Florida."), aff'd, 492 F.3d 1273 (2007), cert. denied, 128 S. Ct. 1226 (2008).

United States v. Woodward, 149 F.3d 46, 67 (1st Cir. 1998) (citing Strassheim & the Eleventh Circuit's Heath decision), cert. denied, 525 U.S. 1138, 119 S. Ct. 1026 (1999); see also, e.g., United States v. Lee, 359 F.3d 194, 198-99, 206-07 (3d Cir.) (Alito, C.J.) (relying on Strassheim in upholding application of New Jersey commercial bribery statute to officer of boxing organization headquartered in New Jersey, even though officer allegedly accepted bribes in Virginia and the agreements to alter the boxing ratings occurred outside New Jersey. "[B]oth the purpose and the effect of the commercial bribery was to cause the [boxing organization], which has its principal place of business in New Jersey, to alter its ranking of boxers. Thus, the conduct in question had effects within New Jersey. . . . [T]he effects within a state of extraterritorial conduct need not be unique to that state in order to justify the exercise of jurisdiction. The effects need only be of sufficient magnitude, and while the effects-test argument was stronger in Woodward than it is here, the effects here were adequate. Moreover, . . . [defendant's] conduct did create the potential for special harm in New Jersey because that is where the [boxing organization] is headquartered and publishes its rankings."), cert. denied, 543 U.S. 955, 125 S. Ct. 408 (2004).[21/]

---

[21]    Numerous states also have relied on Strassheim to exercise jurisdiction when a defendant committed the charged crime in another state. See, e.g., People v. Betts, 34 Cal. 4th 1039, 1044-47, 1055-56, 103 P.3d 883, 885-87, 893 (Citing Strassheim and Skirotes, 313 U.S. 69, 61 S. Ct. 924 (1941), the court stated that "[a]lthough the constitutional limits of state courts' extraterritorial jurisdiction in criminal matters have not been precisely delineated, it is clear that states may extend their jurisdiction beyond the narrow limits imposed by the common law. For example, a state may exercise jurisdiction over criminal acts that take place outside of the state if the results of the crime are intended to, and do, cause harm within the state." The court held that California may exercise jurisdiction where, although the defendant molested his wife's daughters in other states, he formed the intent to molest them in
(continued...)

Courts also have cited <u>Strassheim</u> in ruling that the United States may exercise jurisdiction over drug-related offenses that occurred on the "high seas" outside of the territorial boundaries of the United States. In <u>United States</u> v. <u>Egan</u>, 501 F. Supp. 1252, 1256-57 (S.D.N.Y. 1980), the court held that it possessed jurisdiction to prosecute defendants for possession with intent to distribute marijuana and conspiracy to import and to possess with intent to distribute marijuana where the U.S. Coast Guard recovered thirty tons of marijuana from a ship approximately forty miles off the coast of Montauk, Long Island. Judge Sweet stated that "the United States has the authority to punish the crimes alleged under . . . the objective territorial principle [announced in <u>Strassheim</u>]. . . . A conspiracy on the high seas to commit drug offenses which are intended to have an impact on the United States falls within the objective territorial principle despite the absence of an overt act within the United States." <u>United States</u> v. <u>Egan</u>, 501 F. Supp. at 1257. Judge Sweet emphasized, however, that mere possession of illegal substances, "a crime which would be presumed

---

(...continued)

California.), <u>cert. denied</u>, 545 U.S. 433, 125 S. Ct. 2949 (2005); <u>Keselica</u> v. <u>Commonwealth</u>, 24 Va. App. 115, 119-23, 480 S.E.2d 756, 758-60 (Va. Ct. App. 1997) (Relying on <u>Strassheim</u>, Virginia could exercise jurisdiction where the defendant, while in Maryland, "used the telephone and the mails in a continuing scheme to solicit funds from [a family in Virginia] for the sole purpose of diverting their funds to his own use . . . because [defendant] set in motion a criminal scheme, the immediate result of which caused the intended harm in" Virginia.); <u>but</u> <u>cf</u>. <u>People</u> v. <u>Blume</u>, 443 Mich. 476, 477-79, 493-94, 505 N.W.2d 843, 844-45, 852 (1993) (where defendant, a Florida resident, sold cocaine in Florida to a Michigan resident, the court held, relying on <u>Strassheim</u>, that Michigan could not assert jurisdiction because "'knowledge' . . . only is part of the evidence necessary to support a conviction for conspiracy or aiding and abetting. But knowledge alone is not enough to exercise extraterritorial jurisdiction. The prosecutor must present evidence that defendant intended to commit an act <u>with the intent to have a detrimental effect within this state</u>. That intent does not exist in this case.").

to be strictly local in scope," was not charged, but rather "possession with intent to distribute." United States v. Egan, 501 F. Supp. at 1260.

Similarly, the Fifth Circuit relied on Strassheim's "objective territorial theory" in holding that the United States could exercise jurisdiction to prosecute defendants for possession with the intent to distribute, where the defendants possessed "51,280 pounds of marijuana on an American flag vessel well outside the three-mile territorial jurisdiction of the United States, but within the twelve-mile 'customs waters'" because the defendants "clearly indicated an intent to distribute marijuana within United States boundaries." United States v. Baker, 609 F.2d 134, 135-36, 138 (5th Cir. 1980) (Roney, C.J.). The Fifth Circuit further ruled that the United States could exercise jurisdiction over the conspiracy count even "without proof that any acts whatsoever took place within United States territory." United States v. Baker, 609 F.2d at 139.

> [W]e hold that so long as it is clear that the intended distribution would occur within the territorial United States, as in this case, jurisdiction may be maintained, where defendants are apprehended outside the territorial waters, and inside the contiguous zone. With jurisdiction maintained over the substantive offense, the district court could rightfully exercise jurisdiction over the conspiracy charge.

United States v. Baker, 609 F.2d at 139.

## 2.    Skirotes v. Florida (1941)

The Supreme Court next addressed the issue of territorial jurisdiction in Skirotes v. Florida, 313 U.S. 69, 61 S. Ct. 924 (1941). Florida convicted Skirotes, a Florida resident, of violating a Florida statute that punished sponge fish diving in the Gulf of Mexico. 313 U.S. at 69-70,

61 S. Ct. at 926. Although Skirotes' conduct occurred beyond Florida's territorial waters, the Supreme Court affirmed his conviction, stating that:

> If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress. Save for the powers committed by the Constitution to the Union, the State of Florida has retained the status of a sovereign. . . . When its action does not conflict with federal legislation, the sovereign authority of the State over the conduct of its citizens upon the high seas is analogous to the sovereign authority of the United States over its citizens in like circumstances.

313 U.S. at 77-79, 61 S. Ct. at 929-30. Notably, Skirotes emphasized that the conduct occurred on the "high seas" rather than in another state. 313 U.S. at 76-79, 61 S. Ct. at 929-30; see Seth F. Kreimer, The Law of Choice and Choice of Law: Abortion, the Right to Travel, and Extraterritorial Regulation in American Federalism, 67 N.Y.U.L. Rev. 451, 475 (1992) ("Skiriotes made a point of the fact that the conduct in question occurred 'on the high seas,' rather than in some other state's territory; it is far from a blanket approval of state extraterritorial jurisdiction."); Seth F. Kreimer, Lines in the Sand: The Importance of Borders in American Federalism, 150 U. Pa. L. Rev. 973, 975, 984-85 (2002) ("[T]he more modern cases accept wholly extraterritorial criminal prosecution by states only in circumstances where there is no competing legal permission granted by the sister state where the conduct occurs and where there is some concrete impact on the territorial interests of the prosecuting state." For example, "a shot fired across the border from South Carolina into Georgia is the classic justification for the exercise of Georgia's criminal authority. But an effort by Georgia to prosecute its citizens for gambling in Nevada is aberrant."); Bechler v. Hedgpeth, No. CV-05-

00498, 2008 WL 833235 at *23-24 (C.D. Cal. Feb. 7, 2008) (quoting <u>Skirotes</u> in denying petitioner's

habeas claim that California lacked territorial jurisdiction based on petitioner's having committed

the murder of a California resident on the high seas outside of California's territorial boundaries.  "To

the extent that Petitioner killed the victim outside the territorial jurisdiction of California, California

had a strong interest in prosecuting the crime and the state's adjudication of the charges did not

violate federal law.").

No Supreme Court case since <u>Skirotes</u>, however, has extended its holding to "conduct

wholly within another state."  Kreimer, 67 N.Y.U.L. Rev. at 475 n.79, 481.

**3.** **Supreme Court Venue Decisions**

Although venue deals with the place where judicial authority may be exercised rather

than the court's power to hear a case,[22] Supreme Court cases dealing with proper venue provide some

guidance with respect to where a court may properly try a defendant.

In <u>United States</u> v. <u>Cabrales,</u> 524 U.S. 1, 3-4, 6, 10, 118 S. Ct. 1772, 1774-77 (1998),

the Supreme Court, citing Article III, § 2, cl. 3 of the United States Constitution and the Sixth

---

[22] See, e.g., <u>Lindahl</u> v. <u>Office of Personnel Management</u>, 470 U.S. 768, 793 n.30, 105 S. Ct. 1620, 1634 n. 30 (1985) ("Venue provisions come into play only after jurisdiction has been established and concern 'the place where judicial authority may be exercised'; rather than relating to the power of a court, venue 'relates to the convenience of litigants and as such is subject to their disposition.'"); <u>Moreno-Bravo</u> v. <u>Gonzales</u>, 463 F.3d 253, 258 (2d Cir. 2006) ("Whereas issues of jurisdiction relate to the basic authority of a court to hear and decide a case, venue, by contrast, is in the nature of a convenience to litigants and subject to their disposition. 'This basic difference between the court's power and the litigant's convenience is historic in the federal courts.'").

Amendment,[23] held that Missouri was not a proper venue where the defendant's depositing and withdrawing of money in Florida from a Florida bank was the only conduct constituting the money laundering offenses with which defendant was charged even though the money which defendant deposited was allegedly derived from illegal narcotics activity in Missouri. The Supreme Court stated:

> [T]he counts at issue do not charge [defendant] with conspiracy; they do not link her to, or assert her responsibility for, acts done by others. Nor do they charge her as an aider or abettor . . . in the Missouri drug trafficking. . . . Cabrales is charged in the money-laundering counts with criminal activity "after the fact" of an offense begun and completed by others.

> Whenever a defendant acts "after the fact" to conceal a crime, it might be said, as the Government urges in this case, that the first crime is an essential element of the second, and that the second facilitated the first or made it profitable by impeding its detection. But the question here is the <u>place</u> appropriate to try the "after the fact" actor. As the Government recognizes, it is immaterial whether that actor knew where the first crime was committed. The money launderer must know she is dealing with funds derived from "specified unlawful activity," here, drug trafficking, but the Missouri venue of that activity is, as the Eighth Circuit said, "of no moment."

> . . . .

> But if [defendant] is in fact linked to the drug-trafficking activity, the Government is not disarmed from showing that is the case. She can be, and indeed has been, charged with conspiring with the drug dealers in Missouri. If the Government can prove the agreement it has alleged, [defendant] can be prosecuted in Missouri for that confederacy, and her money laundering in Florida could be shown as overt acts in furtherance of the conspiracy. As the Government acknowledged, the difference in the end result "probably . . . would be negligible."

---

[23] "Article III, § 2, cl. 3, instructs that 'Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed'; the Sixth Amendment calls for trial 'by an impartial jury of the State and district wherein the crime shall have been committed.'" <u>United States</u> v. <u>Cabrales</u>, 524 U.S. at 6, 118 S. Ct. at 1775.

United States v. Cabrales, 524 U.S. at 7-8, 9-10, 118 S. Ct. at 1776-77 (citations omitted).

In United States v. Rodriguez-Moreno, 526 U.S. 275, 276, 119 S. Ct. 1239, 1241 (1999), however, the Supreme Court held that "venue in a prosecution for using or carrying a firearm 'during and in relation to any crime of violence,' in violation of 18 U.S.C. § 924(c)(1), is proper in any district where the crime of violence was committed, even if the firearm was used or carried only in a single district." The Supreme Court distinguished Cabrales, stating that the laundering statutes in Cabrales

> did not proscribe "the anterior criminal conduct that yielded the funds allegedly laundered." The existence of criminally generated proceeds was a circumstance element of the offense but the proscribed conduct-defendant's money laundering activity-occurred "'after the fact' of an offense begun and completed by others." Here, by contrast, given the "during and in relation to" language, the underlying crime of violence is a critical part of the § 924(c)(1) offense.

United States v. Rodriguez-Moreno, 526 U.S. at 280 n.4, 119 S. Ct. at 1243 n.4 (citations omitted).

In United States v. Saavedra, 223 F.3d 85, 86-87, 94 (2d Cir. 2000), cert. denied, 532 U.S. 976, 121 S. Ct. 1612 (2001), the Second Circuit interpreted Cabrales and Rodriguez-Moreno in holding that the Southern District of New York was a proper venue for prosecuting defendants for "conspiring to commit and attempting to commit an assault in aid of racketeering" where defendants, members of the Latin Kings gang, committed all overt acts in planning and carrying out an assault in the Eastern District of New York but the Latin Kings organization was headquartered in the Southern District of New York. The Second Circuit noted, that "[w]here, as in the case at hand, a defendant is charged with conspiracy as well as substantive offenses, venue must be laid in a district where all the counts may be tried. Thus, the venue potential in a conspiracy case for the

prosecutor to choose from is narrowed by the substantive counts the government wishes to prosecute." United States v. Saavedra, 223 F.3d at 89. Nevertheless, the Second Circuit stated that:

> The racketeering element of § 1959 crimes stands in stark contrast to the "after the fact" offense at issue in Cabrales. The statute proscribes conduct that occurs as an inextricable part of the racketeering enterprise, and an effort by defendant to "maintain or increase" his authority or position in a racketeering organization. The statute does not proscribe conduct that occurs "after the fact" of another offense committed and completed by others. . . . Saavedra and Rodriguez were tried under § 1959 because their criminal acts were carried out as part of a group mission by Latin King members and as part of its racketeering activities that § 1959, and RICO laws, aim to dismantle.

United States v. Saavedra, 223 F.3d at 91-92 (citations omitted). The Second Circuit cautioned, however, that even though it had determined that § 1959 was a continuing offense and, thus, venue was statutorily proper, it still needed to ensure that venue in the Southern District of New York did not violate defendants' constitutional rights. United States v. Saavedra, 223 F.3d at 92.

> [A]lthough "the venue requirement is principally a protection for the defendant," other policy considerations are relevant to the proper venue in particular cases. To determine whether the application of a venue provision in a given prosecution comports with constitutional safeguards, a court should ask whether the criminal acts in question bear "substantial contacts" with any given venue. The substantial contacts rule offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial.

United States v. Saavedra, 223 F.3d at 92-93 (citations omitted).

In United States v. Tingle, 183 F.3d 719, 722-23, 727-28 (7th Cir.), cert. denied, 528 U.S. 1048, 120 S. Ct. 584 (1999), however, the Seventh Circuit held that venue was not proper in the Eastern District of Wisconsin to prosecute defendant for distributing cocaine, where defendant sold cocaine on credit to another individual in Chicago and that individual sold cocaine in the

Eastern District of Wisconsin, even though defendant was properly prosecuted in the Eastern District

of Wisconsin for conspiracy to distribute cocaine. Although citing Rodriguez-Moreno for the

proposition that where "'a crime consists of distinct parts which have different localities the whole

may be tried where any part can be proved to have been done'" and noting that distribution of drugs

"can be a continuing offense," the Seventh Circuit found that:

> [T]here was no evidence that Tingle distributed cocaine on June 23, 1996 to Oscar
> Rathers in Wisconsin (the venue of the trial). Instead, the evidence clearly
> established that all of the acts necessary for Tingle's crime of distributing cocaine to
> Rathers were committed in Illinois, and none were committed in Wisconsin. . . .
> Because the government failed to show that even part of the crime of distributing
> cocaine base to Oscar Rathers occurred in the Eastern District of Wisconsin, it was
> not a proper venue for her trial on this charge.

United States v. Tingle, 183 F.3d at 727. The Seventh Circuit, furthermore, distinguished the case

from Rodriguez-Moreno, where kidnapping was an essential element of the firearm charge, in

holding that:

> [Defendant's] conspiracy offense (which was committed in Wisconsin) was not an
> essential element of her distribution charge. Thus, even though she committed at least
> part of the conspiracy offense in Wisconsin, Tingle did not commit any part of the
> charged distribution offense in Wisconsin. Without her having committed at least
> some part of the distribution offense in Wisconsin (and it need only have been a
> small part), venue was not proper there.

United States v. Tingle, 183 F.3d at 728.

### B.    Application of Supreme Court Precedent to New York's Exercise of Jurisdiction

Strassheim v. Daily, 221 U.S. 280, 31 S. Ct. 558 (1911), and its progeny suggest that

New York's exercise of jurisdiction over the three possession counts was not unconstitutional

because Carvajal's "acts" constituting his possession of cocaine in California, which he intended to

be distributed in New York, were "intended to produce" detrimental effects in New York. As to the two possession counts for the cocaine recovered in the white and blue cars, the evidence established that Carvajal intended to produce detrimental effects in New York when, from both California and New York, Carvajal spoke with co-conspirators in both California and New York to direct how the cars should transport cocaine to New York for distribution in New York. (See pages 5, 7-8 above.) Carvajal also conducted surveillance of the white, green and blue cars to ensure that the cars contained the proper amount of drugs and were being dropped off for transport to New York at the proper time and location. (See pages 8-11 above.)

With respect to Carvajal's possession of cocaine in the California stash house, on June 16, 1994, after the agents had seized cocaine from the blue and white cars, Freddy Lasso directed Carvajal to load up a car and transport the drugs from the stash house to New York as soon as possible, and Carvajal agreed. (See page 16 above.) Carvajal's possession of the stash house drugs and his agreement to transport the cocaine from the stash house to New York for distribution in New York shows that he intended his acts to have a detrimental effect in New York. Moreover, while the drugs never reached New York, Carvajal was present in New York, both physically (see page 7 above) and constructively with his phone calls to his New York co-conspirators, since under New York law he was deemed present in New York when he called Freddy Lasso and others who were in New York (see pages 5-6, 8-12, 15-16 above).[24]

_____

[24]    While the evidence showed that Carvajal intended his "acts" of possessing the cocaine in the white and blue cars and in the stash house to have a detrimental effect in New York, it is
(continued...)

The problem with basing this Court's decision on <u>Strassheim</u> and its progeny is that the New York Court of Appeals did not rely on <u>Strassheim</u>'s "effects test," but held, instead, that New York's "jurisdiction over [the possession] offense[s] exists based on a conspiracy occurring in New York to commit that offense." <u>People</u> v. <u>Carvajal</u>, 6 N.Y.3d 305, 313-15, 812 N.Y.S.2d 395, 400-01 (2005); <u>see</u> pages 28-31 above. The New York Court of Appeals' ruling seemingly contradicts the Seventh Circuit's decision in <u>United States</u> v. <u>Tingle</u> that a defendant's "conspiracy offense (which was committed in Wisconsin) was not an essential element of her distribution charge," and, thus, the Eastern District of Wisconsin could not prosecute defendant for distribution of cocaine, even though venue was proper for the overarching conspiracy charge. <u>United States</u> v. <u>Tingle</u>, 183 F.3d 719, 728 (7th Cir.), <u>cert. denied</u>, 528 U.S. 1048, 120 S. Ct. 584 (1999) (discussed on pages 59-60 above). <u>Tingle</u>, however, was a venue decision, and it is unclear whether its analysis, based on <u>Cabrales</u> and <u>Rodriguez-Moreno</u>, would apply to territorial jurisdiction cases. In any event,

_____

<u>24/</u>     (...continued)
arguable that his possession did not actually "produc[e] detrimental effects within" New York because the cocaine was seized before it could arrive in New York. <u>Strassheim</u> v. <u>Daily</u>, 221 U.S. at 284-85, 31 S. Ct. at 560 ("Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, . . . ."). However, in <u>United States</u> v. <u>Woodward</u>, 149 F.3d 46, 67 (1st Cir. 1998), <u>cert. denied</u>, 525 U.S. 1138, 119 S. Ct. 1026 (1999), the First Circuit held that the "potential effect" on Massachusetts when a Massachusetts legislator accepted gratuities out of state from a party interested in Massachusetts legislation constituted a "sufficient nexus" to satisfy <u>Strassheim</u>'s "effects test." Without Supreme Court precedent to the contrary, this Court cannot say that the "potential effect" of Carvajal's possession of the drugs for transportation to New York would not be sufficient to satisfy <u>Strassheim</u>'s "effects test." (Of course, this issue likely would not have had to be addressed if the prosecutors had charged Carvajal with attempted possession instead of possession.)

Tingle is not a Supreme Court decision and, under the AEDPA, only Supreme Court precedent controls.

The Court also notes that being subjected to New York's drug laws could not have surprised Carvajal, despite his claim to the contrary. (Dkt. No. 1: Pet. at 32; Dkt. No. 14: Carvajal Traverse at 5-6.) Whether in New York or California, it is illegal to possess multi-kilogram quantities of cocaine. Thus, as one commentator has stated, "the more modern cases accept wholly extraterritorial criminal prosecution by states only in circumstances where there is no competing legal permission granted by the sister state where the conduct occurs and where there is some concrete impact on the territorial interests of the prosecuting state." Seth F. Kreimer, Lines in the Sand: The Importance of Borders in American Federalism, 150 U. Pa. L. Rev. 973, 984-85 (2002) (also cited at page 55 above). Obviously, Carvajal's conduct was illegal under California law as well as New York law.

For the reasons stated above, whether or not the New York Court of Appeals properly interpreted the state C.P.L.'s criminal long-arm provisions, as a matter of federal constitutional law, this Court cannot say that the New York Court of Appeals' decision was "contrary to" or an "unreasonable application" of Supreme Court precedent. Under the AEDPA, therefore, Carvajal's territorial jurisdiction habeas claim should be DENIED. Because of the paucity of case law in this area and the dissent in the New York Court of Appeals, a certificate of appealability should be granted limited to this issue.

III.     **CARVAJAL'S INEFFECTIVE ASSISTANCE OF COUNSEL HABEAS CLAIMS SHOULD BE DENIED**

    A.     **The <u>Strickland</u> v. <u>Washington</u> Standard on Ineffective Assistance of Trial Counsel**

In <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective:  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Id</u>. at 687, 104 S. Ct. at 2064.[25/]  This performance is to be judged by an objective standard of reasonableness.  <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 688, 104 S. Ct. at 2064.[26/]

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time . . . .  [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

---

[25/]     <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Miller</u>, 500 F.3d 149, 156-57 (2d Cir. 2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d 48, 62-63 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[26/]     <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 521, 123 S. Ct. at 2535; <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 695, 122 S. Ct. 1843, 1850 (2002); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63.

<u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[27]

Second, the defendant must show prejudice from counsel's performance.  <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 687, 104 S. Ct. at 2064.  The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."  <u>Id</u>. at 695, 104 S. Ct. at 2068-69.  Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id</u>. at 694, 104 S. Ct. at 2068.[28]

---

[27]     Accord, <u>e.g.</u>, <u>Bell</u> v. <u>Cone</u>, 535 U.S. at 698, 122 S. Ct. at 1852; <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63; <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 315 (2d Cir. 2001).

[28]     See also, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 534, 123 S. Ct. at 2542; <u>Bell</u> v. <u>Cone</u>, 535 U.S. at 695, 122 S. Ct. at 1850; <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 519 (2d Cir. 2006), <u>cert. denied</u>, 128 S. Ct. 85 (2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63-64; <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d at 95; <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d at 315; <u>DeLuca</u> v. <u>Lord</u>, 77 F.3d 578, 584 (2d Cir.), <u>cert. denied</u>, 519 U.S. 824, 117 S. Ct. 83 (1996).

     "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 694, 104 S. Ct. at 2068; <u>accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 534, 123 S. Ct. at 2542.  The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not."  <u>Strickler</u> v. <u>Greene</u>, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); <u>Nix</u> v. <u>Whiteside</u>, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under <u>Strickland</u>"); <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").  Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility."  <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 291, 119 S. Ct. at 1953; <u>cf</u>. <u>id</u>. at 297-301, 119
(continued...)

The Supreme Court has counseled that these principles "do not establish mechanical rules." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 696, 104 S. Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. <u>Id</u>.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001) (quoting <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 695-96, 104 S. Ct. at 2069); <u>accord</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Hoke</u>, 928 F.2d 534, 538 (2d Cir. 1991).

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 697, 104 S. Ct. at 2069.[29]

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for

---

[28]    (...continued)
S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

[29]    <u>Accord</u>, <u>e.g.</u>, <u>Smith</u> v. <u>Robbins</u>, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 690-91, 104 S. Ct. at 2066.[30/]

As the Second Circuit noted: "The <u>Strickland</u> standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d at 199; <u>accord</u>, <u>e.g.</u>, <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57.

### 1. Strickland and the AEDPA Review Standard

For purposes of this Court's AEDPA analysis, "the <u>Strickland</u> standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[31/] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of

---

[30/] See also, <u>e.g.</u>, <u>Yarborough</u> v. <u>Gentry</u>, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); <u>Engle</u> v. <u>Isaac</u>, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); <u>Jackson</u> v. <u>Leonardo</u>, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing <u>Strickland</u> claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); <u>Mayo</u> v. <u>Henderson</u>, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), <u>cert. denied</u>, 513 U.S. 820, 115 S. Ct. 81 (1994).

[31/] See also, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 518-19 (2d Cir. 2006), <u>cert. denied</u>, 128 S. Ct. 75 (2007); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 315 (2d Cir. 2001).

ineffective assistance of counsel is also 'clearly established.'" Aparicio v. Artuz, 269 F.3d at 95 n.8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. . . . Rather, he must show that the [First Department] applied Strickland to the facts of his case in an objectively unreasonable manner." Bell v. Cone, 535 U.S. at 698-99, 122 S. Ct. at 1852; see also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); Mosby v. Senkowski, 470 F.3d at 519.

### B. Application of the Strickland Standard to Carvajal's Claims

#### 1. Trial Counsel Was Not Ineffective For Withdrawing Defendant's Request For the Jury to Consider the Issue of Territorial Jurisdiction

Carvajal's habeas claim that trial counsel was ineffective for failing to "object to, withdrawal from consideration by the jury, and consequential waiver of the 'territorial jurisdiction' issue from the case" (Dkt. No. 1: Pet. at 32-33, 43; see also Dkt. No. 9: Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 42-45) should be denied.

The New York Court of Appeals held that the trial court possessed territorial jurisdiction over the three possession counts. People v. Carvajal, 6 N.Y.3d 305, 307, 313, 812 N.Y.S.2d 395, 396, 400 (2005). Since the Court of Appeals held that Carvajal's underlying territorial jurisdiction claim was meritless, counsel cannot be found to be ineffective for declining to raise before the jury a meritless issue. See, e.g., United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance."), cert. denied, 531

U.S. 811, 121 S. Ct. 33 (2000); United States v. Kirsh, 54 F.3d 1062, 1071 (2d Cir.) ("the failure to make a meritless argument does not rise to the level of ineffective assistance"), cert. denied, 516 U.S. 927, 116 S. Ct. 330 (1995).[32/]

2.    **Trial Counsel Was Not Ineffective For Failing to Move for a Hearing to Determine Whether the Wiretaps Were Properly Minimized**

Carvajal's briefs to the First Department and New York Court of Appeals and his C.P.L. § 440.10 motion claimed that defense counsel was ineffective for failing to raise

---

[32/]    See also, e.g., United States v. Moland, No. 94-1032, 39 F.3d 1193 (table), 1994 WL 600985 at *2 (10th Cir. Nov. 3, 1994) ("counsel cannot be ineffective for not pursuing a strategy doomed to failure"), cert. denied, 510 U.S. 1057, 114 S. Ct. 722 (1994); Cuevas v. Henderson, 801 F.2d 586, 592 (2d Cir. 1986), cert. denied, 480 U.S. 908, 107 S. Ct. 1354 (1987); Rivera v. Ercole, 07 Civ. 3577, 2007 WL 2706274 at *18 (S.D.N.Y. Sept. 18, 2007) (Peck, M.J.), report & rec. adopted, 2008 WL 627507 (S.D.N.Y. Mar. 7, 2008); Hardison v. Artus, 06 Civ. 0322, 2006 WL 1330064 at * 10 (S.D.N.Y. May 16, 2006) (Peck, M.J.) (& cases cited therein), report & rec. adopted 2006 WL 1763678 (S.D.N.Y. June 23, 2006); Rosario v. Bennett, 01 Civ. 7142, 2002 WL 31852827 at *35 & n.61 (S.D.N.Y Dec. 20, 2002); Franza v. Stinson, 58 F. Supp. 2d 124, 148 (S.D.N.Y. 1999) (Kaplan, D.J. & Peck, M.J.); Duncan v. Greiner, 97 Civ. 8754, 1999 WL 20890 at *10 (S.D.N.Y. Jan. 19, 1999) (since trial counsel's objection would have been fruitless, "the failure to so object is not evidence of ineffective assistance of counsel"); Perez v. United States, 89 CR 800, 96 Civ. 7702, 1997 WL 661426 at *4 (S.D.N.Y. Oct. 23, 1997) ("Defense counsel's failure to object, then, cannot have resulted in actual prejudice to petitioner, as the objection would have been meritless."); United States v. Corcoran, 855 F. Supp. 1359, 1368 (E.D.N.Y. 1994) (where identification found not improper, "counsel's failure to pursue the motion to suppress the in-court identification clearly did not deny defendant the effective assistance of counsel."), aff'd, 100 F.3d 944 (2d Cir.), cert. denied, 517 U.S. 1228, 116 S. Ct. 1864 (1996); Arce v. Smith, 710 F. Supp. 920, 926-27 (S.D.N.Y.) (inasmuch as there was no constitutional error or reversible error under state law, petitioner was not prejudiced by counsel's failure to object and counsel was not ineffective), aff'd, 889 F.2d 1271 (2d Cir. 1989), cert. denied, 495 U.S. 937, 110 S. Ct. 2185 (1990).

minimization[33/] in "pre-trial litigation."  (Dkt. No. 1: Pet. at 43; Dkt. No. 9: Litsky Aff. Ex. D: Carvajal 1st Dep't Br. at 48-50; Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 52-54; Litsky Aff. Ex. L: Carvajal 440 Motion Br. at Point III.)

Carvajal, however, has not established that a pretrial motion would have been fruitful. In his appellate briefs, Carvajal only pointed to Cabbell's inability "to testify that each monitor had been sworn and had received a copy of the minimization order" as evidence that a hearing may have been "fruitful."  (Carvajal Ct. App. Br. at 54.)  Justice Wittner, however, found that all of the monitors were properly given their oaths and instructions.  (Dkt. No. 8: Colloquy: Tr. 2668-69.)

Counsel cannot be found to be ineffective for failing to raise a meritless argument. See cases cited in Point III.B.1 above.

In any event, even if Carvajal may have been able to show at a hearing that some recorded conversations were not properly minimized, Carvajal cannot establish prejudice because the wiretapped conversations admitted into evidence consisted of the entire recording of the phone call (see Gaitain: Tr. 441) and Carvajal's appellate briefs and C.P.L. § 440 motion failed to point to a single admitted conversation that contained non-pertinent information possibly subject to minimization.  (See Dkt. No. 9: Litsky Aff. Ex. D: Carvajal 1st Dep't Br. at 48-50; Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 52-54; Litsky Aff. Ex. L: Carvajal 440 Motion Br. at Point III.)  Thus,

---

[33/]    "'[M]inimization' occurs when law enforcement stops listening to a telephone conversation because the conversation no longer pertains to criminal matters."  United States v. Montilla, 85 Fed. Appx. 227, 229 (2d Cir. 2003).  C.P.L. § 700.30 states that "[a] provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications . . . not otherwise subject to eavesdropping . . . under this article."

Carvajal has not established that the failure of counsel to move for a minimization hearing prejudiced him.  See, e.g., United States v. Carter, 449 F.3d 1287, 1296 (D.C. Cir. 2006) ("Assuming trial counsel's failure to pursue properly [defendant's] minimization claims amounts to a failure to meet the standard for attorney performance under the first prong of the test for ineffective assistance of counsel under Strickland, [defendant] cannot show the requisite prejudice. . . . [Defendant] has failed to show a 'reasonable probability,' that if his trial counsel had properly raised the minimization argument in the motion to suppress the district court would have found the government's efforts at minimization to be unreasonable.") (citation omitted); Findley v. United States, No. 97-CR-230, 03-CV-1723, 2006 WL 1980300 at *7 (D. Conn. July 11, 2006) (Even if counsel improperly failed to "move to suppress certain wiretap evidence on minimization grounds[,] . . . [defendant] has not demonstrated that any such failure prejudiced the outcome of his trial" where there was "no evidence that there were viable grounds for a successful suppression motion."); Grant v. United States, 447 F. Supp. 732, 738 (S.D.N.Y.) ("The failure to raise the minimization question in timely fashion, though it may, in retrospect, have been an error on counsel's part, does not taint counsel's entire performance as ineffective," particularly since the evidence against defendant was overwhelming and counsel was prepared "for the issue" when the trial commenced.), aff'd, 591 F.2d 1330 (2d Cir. 1978).

Accordingly, Carvajal's ineffective assistance of counsel claim for failure to move for a minimization hearing should be DENIED.

### 3. Trial Counsel Was Not Ineffective For Failing to Move to Suppress Physical Evidence

Carvajal's briefs to the First Department and New York Court of Appeals and his C.P.L. § 440.10 motion claimed that counsel was ineffective for failing to move to suppress the physical evidence recovered from Carvajal's person and for failing to controvert the warrants involved in executing the searches of his home, business and car. (See Dkt. No. 9: Litsky Aff. Ex D: Carvajal 1st Dep't Br. at 52; Litsky Aff. Ex I: Carvajal Ct. App. Br. at 54-55; Litsky Aff. Ex L: Carvajal 440.10 Motion Br. at Point III.)

The First Department held that, "[w]hile defendant faults his trial counsel for failing to make an assortment of motions, applications and objections, he has not shown that any of these devices would have succeeded, or that the absence of those actions had any adverse impact on his defense." People v. Carvajal, 14 A.D.3d 165, 174, 86 N.Y.S.2d 450, 457 (1st Dep't 2004). The Court of Appeals affirmed, merely stating that Carvajal's ineffective assistance of counsel claims "lack[ed] merit." People v. Carvajal, 6 N.Y.3d 305, 317, 812 N.Y.S.2d 395, 403 (2005).

A motion to suppress physical evidence or controvert the search warrants would not have been successful because probable cause existed to arrest and search. Warrantless arrests and search warrants both require that probable cause – "information that would lead a reasonable person to conclude it was more probable than not that a crime had been committed, and, that the person being arrested was the perpetrator" – exists. People v. Rivera, 50 A.D.3d 458, 459, 855 N.Y.S.2d 502, 504 (1st Dep't 2008); see C.P.L. § 140.05 ("A person who has committed or is believed to have committed an offense and who is at liberty within the state may . . . be arrested for such offense

although no warrant of arrest therefor has been issued."); <u>Wong Sun</u> v. <u>United States</u>, 371 U. S. 471, 479, 83 S. Ct. 407, 413 (1963) ("The quantum of information which constitutes probable cause – evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed – must be measured by the facts of the particular case.") (citation omitted); <u>People</u> v. <u>Vaccaro</u>, 39 N.Y.2d 468, 470, 384 N.Y.S.2d 411, 413 (1976) ("For without probable cause there can be no search, even with a warrant, it being indeed the function of a warrant to certify that there is such cause."); <u>People</u> v. <u>White</u>,16 N.Y.2d 270, 274, 266 N.Y.S.2d 100, 103 (1965) ("[T]here is no real difference between the quantum of proof required for a search warrant or a search without a warrant. In either instance the issue is 'probable cause' on the particular facts."), <u>cert. denied</u>, 386 U.S. 1008, 87 S. Ct. 1351 (1967).   Here, the wiretap conversations demonstrating Carvajal's leadership in the drug organization and the surveillance of Carvajal managing the stash house and the drug-filled cars heading to New York and meeting Lasso and Grueso in New York certainly provided enough information for law enforcement to reasonably conclude, when they arrested Carvajal and executed the search warrants, that "it was more probable than not" that Carvajal had committed a crime.  Since probable cause existed to arrest Carvajal and execute the search warrants, a motion to suppress physical evidence would not have been successful.  Trial counsel cannot be found to be ineffective for failing to make a meritless motion.  <u>See</u> cases cited in Point III.B.1 above.

### 4. Trial Counsel Was Not Ineffective for Failure to Hire an Expert to Translate the Wiretapped Conversations

Carvajal's briefs to the First Department and Court of Appeals and his C.P.L. § 440.10 motion claimed that counsel was ineffective for failing to hire an expert to independently translate the wiretapped conversations from Spanish to English. (Dkt. No. 9: Litsky Aff. Ex. D: Carvajal 1st Dep't Br. at 50-51; Litsky Aff. Ex. I: Carvajal Ct. App. Br. at 55-56; Litsky Aff. Ex. L: Carvajal 440 Motion Aff. at 26.) Carvajal based his claim on Justice Wittner's statement to a co-defendant's counsel that "if you want to challenge any of the transcripts. . . . The proper way to do it is to [hire] your own expert and prepare your own transcripts." (Tr. 2579.) Carvajal is a native Spanish speaker and was present throughout the trial but neither he nor his appellate counsel have pointed to a single conversation that was translated incorrectly. Carvajal cannot establish that he suffered prejudice from counsel's failure to hire a translator. See, e.g., United States v. Montilla, 85 Fed. Appx. 227, 230 (2d Cir. 2003) (Defendant's claim that counsel was ineffective "for failing to have an independent Spanish translator review the transcripts for accuracy prior to stipulating to their admissibility . . . is . . . unavailing, as defendant has not demonstrated that the transcripts contained any errors such that defense counsel's failure to object or to have the transcripts reviewed resulted in any prejudice to the defendant."). Accordingly, Carvajal's ineffective assistance of counsel claim relating to the hiring of an expert translator should be DENIED.

### 5. Trial Counsel's Failure to Call Any Witnesses was a Reasonable Strategic Decision and Did Not Constitute Deficient Performance

Carvajal's C.P.L. § 440 motion claims that his counsel was ineffective for not calling any witnesses. (See Dkt. No. 9: Litsky Aff. Ex L: Carvajal 440 Motion Br. at Point III.)

Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 958, 108 S. Ct. 357 (1987); see, e.g., United States v. DeJesus, 57 Fed. Appx. 474, 478 (2d Cir.) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." Counsel's decision not to call a particular witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses.") (citation omitted), cert. denied, 538 U.S. 1047, 123 S. Ct. 2110 (2003).[34]

---

[34] See also, e.g., United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), cert. denied, 538 U.S. 1021, 123 S. Ct. 1949 (2003); United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998), cert. denied, 526 U.S. 1164, 119 S. Ct. 2059 (1999); United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.) ("[T]he tactical decision of whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation."), cert. denied, 522 U.S. 846, 118 S. Ct. 130 (1997); Lawson v. Caspari, 963 F.2d 1094, 1096 (8th Cir. 1992) (Counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, especially where counsel "presented a theory of the case by pointing out the 'weaknesses in the state's (continued...)

More importantly, "[g]enerally, the decision whether to pursue a particular defense is a tactical choice which does not rise to the level of a constitutional violation. . . . [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed . . . ,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial." Jones v. Hollins, 884 F. Supp. at 765-66 (citations omitted).

Moreover, a petitioner may not merely allege that certain witnesses might have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such testimony would have changed the result. See, e.g., Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) ("To affirmatively prove prejudice [from counsel's failure to investigate],

---

[34/]   (...continued)
case and rais[ing] serious questions about the credibility of the state's sole eyewitness.'");
Reid v. Giambruno, No. 03-CV-0240, 2007 WL 3232497 at *11 (W.D.N.Y. Oct. 31, 2007);
Harris v. Hollins, 95 Civ. 4376, 1997 WL 633440 at *6 (S.D.N.Y. Oct. 14, 1997) (counsel not ineffective for not securing alibi witnesses where counsel presented a vigorous defense);
Jones v. Hollins, 884 F. Supp. 758, 765-66 (W.D.N.Y. 1995) ("Generally, the decision whether to pursue a particular defense is a tactical choice which does not rise to [the] level of a constitutional violation. . . . [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed . . . ,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial.") (citations omitted), aff'd, No. 95-2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); Lou v. Mantello, No. 98-CV-5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.'") (quoting Ruzas v. Sullivan, 85 Civ. 4801, 1988 WL 83377 at *14 (S.D.N.Y. Aug. 2, 1988)); Rodriguez v. Mitchell, 92 Civ. 2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial."), cert. denied, 513 U.S. 1161, 115 S. Ct. 1124 (1995); Greenidge v. United States, No. 01 CV 4143, 2002 WL 720677 at *2 (E.D.N.Y. Mar. 27, 2002) (§ 2255 case; petitioner's ineffective assistance of counsel claim has no merit where petitioner "nowhere specifies how the testimony of those witnesses [counsel purportedly failed to call] would have been helpful to his defense.").[35]

        As this Court has previously held, "'[t]he decision of whether to call or bypass a particular witness is a question of trial strategy which courts will practically never second-guess. . . . Additionally, a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice.'" Cromwell v. Keane, 98 Civ. 0013, 2002 WL 929536 at *24 (S.D.N.Y. May 8, 2002) (Peck, M.J.) (quoting Ozuru v. United States, No. 95 CV 2241, 1997 WL

---

[35] See also, e.g., Lou v. Mantello, 2001 WL 1152817 at *10 ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.'") (citations omitted); Muhammad v. Bennett, 96 Civ. 8430, 1998 WL 214884 at *1 (S.D.N.Y. Apr. 29, 1998) ("petitioner's speculative claim about the testimony of an uncalled witness" is insufficient to show ineffective assistance of trial counsel); Burke v. United States, 91 Civ. 468, 1992 WL 183752 at *2 (S.D.N.Y. July 22, 1992) (petitioner's "contention that he was denied effective assistance of counsel" where "his attorney failed to subpoena several witnesses who would have aided his defense is wholly insufficient given [petitioner]'s failure to set forth who the specific witnesses are or their relevant testimony."); Croney v. Scully, No. 86-CV-4335, 1988 WL 69766 at *2 (E.D.N.Y. Jun. 13, 1988) ("Petitioner's contention that assignment of an investigator would have been helpful to his defense is conclusory and speculative. Petitioner must show not only that the testimony would have been favorable, but also that the witness would have testified at trial."), aff'd, 800 F.2d 1318 (2d Cir. 1989).

124212 at *4 (E.D.N.Y. Mar. 11, 1997), aff'd, 152 F.3d 920 (2d Cir. 1998), cert. denied, 525 U.S. 1083, 119 S. Ct. 828 (1999)).

Carvajal's C.P.L. § 440 motion failed to name any witness that counsel should have called, much less whether any such witness would have been willing to testify, what the testimony would have been, or how the testimony would have affected the outcome of the trial. The evidence against Carvajal was strong, including his wiretapped conversations with his co-conspirators and surveillance. It is not surprising that there were no witnesses to call in his defense. Carvajal's habeas claim that his counsel was ineffective for failing to call any witnesses should be DENIED.

### 6. Carvajal's Claim That His Trial Counsel Was Ineffective For Failure To Challenge Whether A Grand Jury Indicted Carvajal Should Be Denied As Unexhausted But Deemed Exhausted And Procedurally Barred

Carvajal claims that trial counsel was ineffective for failing to challenge whether a grand jury indicted Carvajal, specifically asserting that only the superceding indictment, not the original indictment, listed his name in the caption. (See Dkt. No. 1: Pet. at 43-44; Dkt. No. 9: Litsky Aff. Ex. A: Indictment.) Carvajal, however, never raised this claim in his direct appeal, C.P.L. § 440 motions or coram nobis application. Thus, any such claim is unexhausted but deemed exhausted and procedurally barred.

### a. The Exhaustion Doctrine: Background

Section 2254 codifies the exhaustion requirement, providing that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available

in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A).[36/] As the Supreme Court has made clear,

"[t]he exhaustion doctrine is principally designed to protect the state courts' role in the enforcement

of federal law and prevent disruption of state judicial proceedings." Rose v. Lundy, 455 U.S. at 518,

102 S. Ct. at 1203; accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 845, 119 S. Ct. at 1732.

The Second Circuit determines whether a claim has been exhausted by applying a

two-step analysis:

> First, the petitioner must have fairly presented to an appropriate state court the same
> federal constitutional claim that he now urges upon the federal courts. . . . Second,
> having presented his federal constitutional claim to an appropriate state court, and
> having been denied relief, the petitioner must have utilized all available mechanisms
> to secure [state] appellate review of the denial of that claim.

Diaz v. Coombe, 97 Civ. 1621, 1997 WL 529608 at *3 (S.D.N.Y. June 12, 1997) (Mukasey, D.J.

& Peck, M.J.) (quoting Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981)); accord, e.g., O'Sullivan

v. Boerckel, 526 U.S. at 843-48, 119 S. Ct. at 1732-34.

"The exhaustion requirement is not satisfied unless the federal claim has been 'fairly

presented' to the state courts." Daye v. Attorney Gen., 696 F.2d at 191.[37/] The Second Circuit has

---

[36/] See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999); Rose v. Lundy, 455 U.S. 509, 515-16, 102 S. Ct. 1198, 1201 (1982) ("The exhaustion doctrine existed long before its codification by Congress in 1948" in 28 U.S.C. § 2254.); Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054, 115 S. Ct. 1436 (1995); Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990); Daye v. Attorney Gen., 696 F.2d 186, 190-94 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048, 104 S. Ct. 723 (1984).

[37/] Accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 844, 119 S. Ct. at 1732; Picard v. Connor, 404 U.S. at 275-76, 92 S. Ct. at 512; Jones v. Keane, 329 F.3d 290, 294-95 (2d Cir.), cert. denied, 540 U.S. 1046, 124 S. Ct. 804 (2003); Cox v. Miller, 296 F.3d 89, 99 (2d Cir. 2002), (continued...)

held that a federal habeas petitioner must have alerted the state appellate court that a federal

constitutional claim is at issue.  E.g., <u>Cox</u> v. <u>Miller</u>, 296 F.3d at 99; <u>Jones</u> v. <u>Vacco</u>, 126 F.3d at 413-

14; <u>Grady</u> v. <u>LeFevre</u>, 846 F.2d 862, 864 (2d Cir. 1988); <u>Petrucelli</u> v. <u>Coombe</u>, 735 F.2d 684, 688-89

(2d Cir. 1984); <u>Daye</u> v. <u>Attorney Gen.</u>, 696 F.2d at 191.  In <u>Daye</u>, the Second Circuit en banc stated:

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

<u>Daye</u> v. <u>Attorney Gen.</u>, 696 F.2d at 194.[38/]

### b. Carvajal's Grand Jury Indictment Claim Was Not Presented To The State Courts And Thus Is Unexhausted But Deemed Exhausted And Procedurally Barred

Carvajal did not raise his grand jury indictment ineffective assistance claim in his

direct appeals or C.P.L. § 440 motion.  (<u>See</u> pages 35-36 above.)

---

[37/]   (...continued)
cert. denied, 537 U.S. 1192, 123 S. Ct. 1273 (2003); <u>Jones</u> v. <u>Vacco</u>, 126 F.3d 408, 413 (2d Cir. 1997).

[38/]   <u>Accord, e.g.</u>, <u>Smith</u> v. <u>Duncan</u>, 411 F.3d 340, 348 (2d Cir. 2005); <u>Jackson</u> v. <u>Edwards</u>, 404 F.3d 612, 618 (2d Cir. 2005); <u>Rosa</u> v. <u>McCray</u>, 396 F.3d 210, 217-18 (2d Cir.), <u>cert. denied</u>, 126 S. Ct. 215 (2005); <u>St. Helen</u> v. <u>Senkowski</u>, 374 F.3d 181, 182-83 (2d Cir. 2004), <u>cert. denied</u>, 543 U.S. 1058, 125 S. Ct. 871 (2005); <u>Cox</u> v. <u>Miller</u>, 296 F.3d at 99; <u>Ramirez</u> v. <u>Attorney Gen.</u>, 280 F.3d 87, 95 (2d Cir. 2001); <u>Levine</u> v. <u>Comm'r of Corr. Servs.</u>, 44 F.3d 121, 124 (2d Cir. 1995), <u>cert. denied</u>, 520 U.S. 1106, 117 S. Ct. 1112 (1997); <u>Grady</u> v. <u>LeFevre</u>, 846 F.2d at 864; <u>Garofolo</u> v. <u>Coomb</u>, 804 F.2d 201, 206 (2d Cir. 1986); <u>Petrucelli</u> v. <u>Coombe</u>, 735 F.2d at 688.

"'For exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."'" <u>Reyes</u> v. <u>Keane</u>, 118 F.3d 136, 139 (2d Cir. 1997) (quoting <u>Grey</u> v. <u>Hoke</u>, 933 F.2d 117, 120 (2d Cir. 1991) (quoting <u>Harris</u> v. <u>Reed</u>, 489 U.S. 255, 263 n.9, 109 S. Ct. 1038, 1043 n.9 (1989))).[39/] "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." <u>Grey</u> v. <u>Hoke</u>, 933 F.2d at 120. Consequently, such procedurally barred claims are "deemed exhausted" by the federal courts. <u>E.g.</u>, <u>St. Helen</u> v. <u>Senkowski</u>, 374 F.3d at 183; <u>DiGuglielmo</u> v. <u>Smith</u>, 366 F.3d at 135; <u>McKethan</u> v. <u>Mantello</u>, 292 F.3d at 122-23; <u>Ramirez</u> v. <u>Attorney Gen.</u>, 280 F.3d at 94; <u>Reyes</u> v. <u>Keane</u>, 118 F.3d at 139; <u>Bossett</u> v. <u>Walker</u>, 41 F.3d at 828; <u>Washington</u> v. <u>James</u>, 996 F.2d 1442, 1446-47 (2d Cir. 1993), <u>cert. denied</u>, 510 U.S. 1078, 114 S. Ct. 895 (1994); <u>Grey</u> v. <u>Hoke</u>, 933 F.2d at 120-21.

---

[39/]    <u>Accord</u>, <u>e.g.</u>, <u>Castille</u> v. <u>Peoples</u>, 489 U.S. 346, 350, 109 S. Ct. 1056, 1059 (1989) ("It would be inconsistent with [§ 2254(b)], as well as with underlying principles of comity, to mandate recourse to state collateral review whose results have effectively been predetermined"); <u>St. Helen</u> v. <u>Senkowski</u>, 374 F.3d 181, 183 (2d Cir. 2004) ("even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law."); <u>DiGuglielmo</u> v. <u>Smith</u>, 366 F.3d 130, 135 (2d Cir. 2004) (petitioner's procedurally defaulted claims deemed exhausted where he could no longer obtain state-court review because of his procedural default); <u>McKethan</u> v. <u>Mantello</u>, 292 F.3d 119, 122-23 (2d Cir. 2002) (claims deemed exhausted where they were "procedurally barred for not having been raised in a timely fashion"), <u>cert. denied</u>, -- S. Ct. --, 2008 WL 2754150 (Oct. 6, 2008); <u>Ramirez</u> v. <u>Attorney Gen.</u>, 280 F.3d 87, 94 (2d Cir. 2001); <u>Bossett</u> v. <u>Walker</u>, 41 F.3d 825, 828 (2d Cir. 1994) ("[I]f the petitioner no longer has 'remedies available' in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted."), <u>cert. denied</u>, 514 U.S. 1054, 115 S. Ct. 1436 (1995).

It is clear that Carvajal is now barred from raising a grand jury indictment claim in state court because such a claim could have been raised on direct appeal, but was not.[40/]  As the Second Circuit explained in <u>Washington</u> v. <u>James</u>:

> Consequently, we do not believe [petitioner] has fairly presented to the state courts his constitutional objection. . . . [T]he state courts have not had an opportunity to address the federal claim raised on habeas review and this normally would preclude our review of that claim.
>
> . . . .
>
> As we have already noted, this preclusion is not technically the result of a failure to exhaust state remedies, but is due to a procedural default.  [Petitioner] no longer has the right to raise his claim under New York law either on direct appeal, <u>see</u> McKinney's 1993 Revised N.Y. Court Rules § 500.10(a), or on collateral review. New York's collateral procedures are unavailable because [petitioner] could have raised the claim on direct review but did not.  <u>See</u> N.Y. Crim. Proc. Law § 440.10(2)(c).  Therefore [petitioner] has no further recourse in state court.  <u>See</u> 28 U.S.C. § 2254(c); <u>Grey</u> v. <u>Hoke</u>, 933 F.2d [at] 120. . . . Because he failed to raise his claim in state court and no longer may do so, his claim is procedurally defaulted.

996 F.2d at 1446-47.[41/]

---

[40/]    C.P.L. § 440.10(2)(c) states, in pertinent part:

> 2.  Notwithstanding the provisions of subdivision one, the court must deny a motion to vacate a judgment when:
>
> . . . .
>
> (c)  Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to . . .  raise such ground or issue upon an appeal actually perfected by him . . . .

[41/]    <u>See also</u>, <u>e.g.</u>, <u>Galdamez</u> v. <u>Keane</u>, 394 F.3d 68, 73-74 (2d Cir.) ("a petitioner cannot claim
                                                                    (continued...)

To avoid a procedural default on his unexhausted claim, Carvajal would have to "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result in a 'fundamental miscarriage of justice,'" i.e., a showing of "actual innocence." Harris v. Reed, 489 U.S. at 262, 109 S. Ct. at 1043 (citations omitted); accord, e.g., Schlup v. Delo, 513 U.S. 298, 324-27, 115 S. Ct. 851, 865-67 (1995); Coleman v. Thompson, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991).[42]

Carvajal has not alleged cause and prejudice nor has he made a showing of actual innocence. Thus, Carvajal's unexhausted grand jury indictment ineffective assistance claim should be DENIED as barred from habeas review.

---

[41]   (...continued)
to have exhausted his or her remedies by dint of no longer possessing 'the right under the law of the State to raise, by any available procedure, the question presented,' if at some point the petitioner had that right but failed to exercise it.") (citation omitted), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996 (2005); DiGuglielmo v. Smith, 366 F.3d at 135 (Second Circuit affirmed denial of petitioner's habeas claim because "his claims were not properly exhausted and . . . his procedural default is not excusable."); Jones v. Keane, 329 F.3d 290, 296 (2d Cir.) ("[Petitioner] has procedurally defaulted his vagueness claim since New York's procedural rules now bar [petitioner] from raising it in New York courts. Further direct review by the Court of Appeals is no longer available. . . ."), cert. denied, 540 U.S. 1046, 124 S. Ct. 804 (2003); Reyes v. Keane, 118 F.3d at 139 ("Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record.") (emphasis added).

[42]   See also, e.g., Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); Smith v. Duncan, 411 F.3d 340, 347 (2d Cir. 2005); DeBerry v. Portuondo, 403 F.3d 57, 64 (2d Cir.), cert. denied, 546 U.S. 884, 126 S. Ct. 225 (2005); St. Helen v. Senkowski, 374 F.3d at 183-84; DiGuglielmo v. Smith, 366 F.3d at 135; Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996), cert. denied, 520 U.S. 1108, 117 S. Ct. 1116 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

## IV.    CARVAJAL'S HABEAS CLAIM THAT HE WAS DENIED COUNSEL OF CHOICE IS MERITLESS

Carvajal's habeas petition claims that he was denied his right to counsel of choice because Justice Wittner allowed retained counsel to withdraw due to Carvajal's inability to pay counsel's fees and appointed counsel for Carvajal.  (Dkt. No. 1: Pet. at 37-46; see also Dkt. No. 14: Carvajal Traverse at 1-5, 7-10.)

While Carvajal claimed that he was denied his right to counsel of choice in his First Department brief, Carvajal failed to expand the record to include the relevant transcripts.  (Dkt. No. 9: Litsky Aff. Ex. D: Carvajal 1st Dep't Br. at 54-55; Dkt. No. 10: State Br. at 61 n.18.)  The First Department held that Carvajal's claim that he was deprived of his right to counsel of choice "rests entirely on factual assertions outside the record and is thus unreviewable."  People v. Carvajal, 14 A.D.3d 165, 174, 786 N.Y.S.2d 450, 457 (1st Dep't 2004).

Carvajal raised the claim again in his C.P.L. § 440 motion.  (Litsky Aff. Ex. L: Carvajal 440 Motion Br. at Point I.)  According to Carvajal's C.P.L. § 440.10 motion, Carvajal retained Jeffrey Hoffman on October 18, 1994 and "advanced" him $15,000.  (Carvajal 440 Motion Aff. at 3.)  Hoffman and Carvajal agreed to an initial retainer fee of $20,000 and an additional trial fee of $30,000.  (Carvajal 440 Motion Aff. at 5 n.3.)  Thereafter, Hoffman represented Carvajal at his arraignments on the indictment and superceding indictment and negotiated a plea offer for Carvajal.  (Carvajal 440 Motion Aff. at 3-6; State Br. at 61.)  When Carvajal refused the plea offer, Carvajal alleges that Hoffman told him that, if Carvajal wanted to proceed to trial, the fee would be $150,000 instead of the $50,000 originally negotiated.  (Carvajal 440 Motion Aff. at 5 & n.3.)  On

January 6, 1995, Hoffman appeared in court without Carvajal present and requested "an extension of time to withdraw from the case." (Carvajal 440 Motion Aff. at 5-6.) Justice Wittner held a hearing for Hoffman to show cause for his withdrawal; at the hearing, Carvajal stated that he had already paid Hoffman $15,000 and was trying to sell his music-related business to pay the remaining fee. (Carvajal 440 Motion Aff. at 6.) Justice Wittner, nevertheless, relieved Hoffman for Carvajal's non-payment of legal fees. (See Carvajal 440 Motion Aff. at 6-7.) On February 24, 1995, Justice Wittner appointed Emanuel Moore as Carvajal's counsel. (See Carvajal 440 Motion Aff. at 7.)[43]

In response to Carvajal's § 440 motion, the State responded that Carvajal was not denied his right to counsel of choice. (See Litsky Aff. Ex. M: State Opp. Br. to Carvajal 440 Motion Aff. at 15-17.) The State noted that Carvajal "has failed completely to provide record support for his assertions that the court relieved retained counsel in defendant's absence, that defendant was not advised he could retain a second lawyer, that he did not know that he could not retain a second

---

[43] To support his present claim, Carvajal has attached: (a) a "Billing Worksheet" from Hoffman listing a charge for a court appearance on January 6, 1995 "re extension of time for withdrawal" (Pet. Ex. A); (b) the court jacket showing that Hoffman was relieved and Emanuel Moore was assigned on February 6, 1995 (Pet. Ex. B); (c) a letter from the Chief Clerk of Supreme Court, New York County, advising Carvajal that Justice Wittner requested that a new attorney be assigned to Carvajal on January 25, 1995 and that Emmanuel Moore filed a notice of appearance on February 6, 1995 (Pet. Ex. C); (d) Assignment of Counsel Worksheet showing that Emanuel Moore was assigned on January 27, 1995 (Pet. Ex D); (e) October 28, 1994 arraignment minutes during which Justice Wittner announced in Carvajal's presence as Carvajal entered a not guilty plea, that "[t]he main attorney is Jeffrey Hoffman" (Pet. Ex. H at 3); and (f) February 6, 1995 minutes, without Carvajal's presence, during which Justice Wittner announced that "Mr. [Emanuel] Moore has been assigned [and] Mr. Hoffman had been relieved" (Pet. Ex. I at 2).

lawyer on his own, and that he forfeited his retainer as a result of the court's actions." (State 440 Motion Opp. Br. at 17.)

On November 30, 2006, Justice Wittner denied Carvajal's motion "pursuant to CPL. 440.10(2) and for the substantive reasons set forth in the People's opposing papers." (Litsky Aff. Ex. N: Justice Wittner 440.10 Decision; see pages 37-38 above.)

### A.    The Right to Counsel of Choice

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has recognized that a component of that right is a qualified "right to select and be represented by one's preferred attorney." Wheat v. United States, 486 U.S. 153, 159, 108 S. Ct. 1692, 1697 (1988).[44/] The right stems from the defendant's constitutional right to determine his defense:

> The right to retain counsel of choice stems from a defendant's right to decide what kind of defense he wishes to present. "Attorneys are not fungible"; often "the most important decision a defendant makes in shaping his defense is his selection of an attorney." When a defendant is financially able to retain counsel, the choice of counsel rests in his hands, not in the hands of the state. A defendant's right to retain counsel of his choice therefore

---

[44/]    See also, e.g., Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25, 109 S. Ct. 2646, 2651-52 (1989); Glasser v. United States, 315 U.S. 60, 70-71, 75, 62 S. Ct. 457, 464-65, 467 (1942) (Defendant "wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an accused should be respected."); Powell v. Alabama, 287 U.S. 45, 53, 53 S. Ct. 55, 57 (1932) ("a defendant should be afforded a fair opportunity to secure counsel of his own choice"); United States v. Cunningham, 672 F.2d 1064, 1070 (2d Cir. 1982) ("We have consistently recognized that the right of a defendant who retains counsel to be represented by that counsel is a right of constitutional dimension.") (internal quotations omitted), cert. denied, 466 U.S. 951, 104 S. Ct. 2154 (1984).

represents "'a right of constitutional dimension,'" the denial of which may rise to the level of a constitutional violation.

United States v. Collins, 920 F.2d 619, 625 (10th Cir. 1990) (citations omitted), cert. denied, 500 U.S. 920, 111 S. Ct. 2022 (1991).

The Supreme Court in 2006 reiterated that, while "'the Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds,' . . . the right to counsel of choice 'is circumscribed in several important respects'. . . . [T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them. . . . We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness. . . ." United States v. Gonzalez-Lopez, 548 U.S. 140, 144, 152, 126 S. Ct. 2557, 2561, 2565-66 (2006) (citations omitted).[45] "Thus, the right to counsel of one's choice may be circumscribed when it impinges upon other fundamental rights or 'interfere[s] with the fair administration of justice.'" Persad v. Conway, No. 05-CV-4199, 2008 WL 268812 at *8 (E.D.N.Y. Jan. 30, 2008) (quoting McKee v. Harris, 649 F.2d 927, 931 (2d Cir.1981), cert. denied, 456 U.S. 917, 102 S. Ct. 1773 (1982)).

---

[45] "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. at 159, 108 S. Ct. at 1697.

### B. Justice Wittner's Denial of Carvajal's Claim that He Was Denied His Right to Counsel of Choice Was Not Contrary To Nor an Unreasonable Application of Supreme Court Precedent

Even if Carvajal's allegation that Justice Wittner allowed retained counsel to withdraw based on Carvajal's inability to pay counsel's fee is true, Justice Wittner's decision is not "contrary to" nor an "unreasonable application of" Supreme Court precedent. Although federal courts generally do not permit an attorney to withdraw from representation for "'[n]on-payment of legal fees, without more,'" United States v. Parker, 439 F.3d 81, 104 (2d Cir.) (upholding district court's refusal to allow counsel to withdraw), cert. denied, 127 S. Ct. 456 (2006), Carvajal has not cited, and this Court has not found, any Supreme Court decision (nor even a Second Circuit or New York Court of Appeals decision) holding that a trial court's decision to permit an attorney to withdraw for non-payment of legal fees would violate a defendant's right to counsel of choice. In fact, under New York Law, a "criminal defendant does not have a categorical right to insist that a retained or assigned attorney continue to represent him." People v. Childs, 247 A.D.2d 319, 325, 670 N.Y.S.2d 4, 9-10 (1st Dep't), appeal denied, 92 N.Y.2d 849, 677 N.Y.S.2d 79 (1998); see also, e.g., United States v. Herbawi, 913 F. Supp. 170, 172-73 (W.D.N.Y. 1996) ("While the defendant's default in paying the balance due on a fee agreement may not, in and of itself, ordinarily be sufficient to warrant appointment under the CJA, . . . the inability of [defendant] to meet the terms of the original retainer agreement, coupled with the enormous complexity of the superseding indictment, justifies granting [counsel's] request to be relieved as retained counsel for the defendant.").

To the extent that Carvajal intended to incorporate his C.P.L. § 440.10 claim that Justice Wittner denied Carvajal his right to counsel of choice by appointing counsel for Carvajal

without allowing Carvajal the opportunity to retain counsel, that claim is not credible. (Dkt. No. 9: Litsky Aff. Ex. L: Carvajal 440 Motion Aff. at 7.)  Carvajal never alleges, nor does the record support, that Justice Wittner refused to allow Carvajal to retain his own counsel or that Carvajal attempted to retain counsel.  It is unbelievable that Carvajal, who was experienced with the criminal justice system and with retaining an attorney, would not have raised the issue of retaining a new attorney if he so desired or tried to obtain an attorney in the year before trial.  Moreover, it is clear from the record that Carvajal knew of his right to retain counsel – he had retained Hoffman, after all, and this was not Carvajal's first experience with the criminal justice system.  Nor was it unreasonable for Justice Wittner to assume that it was necessary to appoint counsel for Carvajal when the very reason for Hoffman's application to withdraw was non-payment of his fee.  Finally, Carvajal has not cited any case (nor has this Court found any Supreme Court case) holding that the trial court must advise a defendant of his right to retain counsel.

Accordingly, Justice Wittner's denial of Carvajal's counsel of choice claim was not "contrary to nor an unreasonable application" of Supreme Court precedent, and Carvajal's counsel of choice habeas claim should be DENIED.

## IV. CARVAJAL'S HABEAS CLAIM THAT THE TRIAL COURT ERRED IN REFUSING TO CONSIDER HIS PRO SE MOTIONS IS PROCEDURALLY BARRED BY ADEQUATE AND INDEPENDENT STATE LAW GROUNDS

Carvajal's C.P.L. § 440 motion claimed that the "trial court's refusal to consider [Carvajal]'s pro se pre-trial motions was reversible error where . . . the motions were meritorious and

designed to compensate for appointed counsel's failure to conduct discovery and submit appropriate pretrial motions." (Dkt. No. 9: Litsky Aff. Ex. L: Carvajal 440 Motion Br. at Point II.)[46/]

Justice Wittner denied Carvajal's C.P.L. § 440 motion "pursuant to CPL 440.10(2) and for the substantive reasons set forth in the People's opposing papers." (Litsky Aff. Ex. N: Justice Wittner 440.10 Decision.) The State's response to Carvajal's C.P.L. § 440.10 motion did not address whether the trial court erred by refusing to consider his pre-trial pro se motions. (Litsky Aff. Ex. M: State 440 Motion Opp. Br.; see pages 36-37 above.) Thus, Justice Wittner must have denied this claim pursuant to C.P.L. § 440.10(2), since this record-based claim could have been raised on appeal, but "no such appellate review or determination occurred owing to the defendant's unjustifiable failure to . . . raise such ground" on appeal. C.P.L. § 440.10(2)(c). See Quirama v. Michele, 983 F.2d 12 (2d Cir. 1993) (Although the First Department rejected defendant's claims without opinion, the decision rested on an adequate and independent state procedural ground sufficient to bar habeas review because "[t]he claims in issue were not raised in the trial court, and the procedural bar was argued by the state on appeal. There is no 'good reason' to believe that the Appellate Division's silence reflects a decision on the merits.").

The cases in this Circuit hold that C.P.L. § 440.10(2) is an "adequate and independent" state procedural ground barring federal habeas review. See, e.g., Sweet v. Bennett, 353 F.3d 135, 140-41 (2d Cir. 2003) (petitioner's ineffective assistance claim was "well-established in

_____

[46/] While Carvajal did not explicitly raise this claim in his habeas petition, he did "incorporate[] by reference . . . [his] application pursuant to C.P.L. 440.10 (1)(a), (1) (h), . . . ." (Dkt. No. 1: Pet. at 47.)

the trial record" and could have been brought on direct appeal and § 440.10(2)(c) was an adequate and independent state law ground that barred federal habeas review); <u>Davis</u> v. <u>Mantello</u>, 42 Fed. Appx. 488, 490 (2d Cir. 2002) ("The unjustifiable failure to raise on direct appeal a claim that appears on the face of the record is a procedural default under New York law and therefore constitutes an independent and adequate state ground for the state court's rejection of the petitioner's claim."), <u>cert. denied</u>, 538 U.S. 986, 123 S. Ct. 1803 (2003); <u>Reyes</u> v. <u>Keane</u>, 118 F.3d 136, 139 (2d Cir. 1997); <u>Dorsey</u> v. <u>Irvin</u>, 56 F.3d 425, 426 (2d Cir. 1995); <u>Levine</u> v. <u>Commissioner of Corr. Servs.</u>, 44 F.3d 121, 126 (2d Cir. 1995) (§ 440.10(2)(c) is adequate and independent state ground); <u>Johnson</u> v. <u>Sabourin</u>, 03 Civ. 0791, 2005 WL 2663039 at *3-5 (S.D.N.Y. Oct. 13, 2005) (§ 440 court's denial of ineffective assistance claims based on facts in trial record pursuant to C.P.L. § 440.10(2)(b) was an adequate and independent state law ground barring federal habeas review); <u>Gillespie</u> v. <u>Miller</u>, 04 Civ. 0295, 2004 WL 1689735 at *12 (S.D.N.Y. July 29, 2004) (Peck, M.J.) (state court's denial of ineffective assistance claim under C.P.L. § 440.10(2) because it could have been raised on direct appeal is adequate and independent ground); <u>Ramos</u> v. <u>Costello</u>, 96 Civ. 3659, 1997 WL 231129 at *2 (S.D.N.Y. May 7, 1997) ("The procedural ground on which the state court denied his § 440.10 motion" – "namely, that they were barred by a New York rule precluding claims that could have been raised on direct appeal but were not" – "is an independent and adequate state ground that prevents him from asserting those claims in a federal habeas corpus proceeding absent cause and prejudice."); <u>Wells</u> v. <u>LaFavre</u>, 96 Civ. 3417, 1996 WL 692003 at *3 (S.D.N.Y. Dec. 2,

1996) ("C.P.L. § 440.10(2) presents an adequate and independent state ground for denying Petitioner relief.").[47]

Because there is an adequate and independent finding by the state § 440 court that Carvajal had procedurally defaulted the trial court error claim, Carvajal would have to show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991); see pages 37-38 above. Carvajal does not allege cause, prejudice or a fundamental miscarriage of justice. Thus, Carvajal's trial court error claim is procedurally barred from habeas review.

## V. TO THE EXTENT CARVAJAL INCLUDES CLAIMS THAT HE RAISED IN HIS BRIEF TO THE FIRST DEPARTMENT BUT NOT IN HIS LEAVE LETTERS TO THE COURT OF APPEALS, THOSE CLAIMS ARE UNEXHAUSTED BUT DEEMED EXHAUSTED AND PROCEDURALLY BARRED

Carvajal's habeas petition "incorporates by reference the Brief in Support, i.e., the appellate brief, . . . ." (Dkt. No. 1: Pet. at 47.) To the extent that Carvajal intended his habeas

---

[47] See also, e.g., Flowers v. Irvine, No. 94-CV-2240, 1995 WL 669913 at *4 (E.D.N.Y. Oct. 31, 1995) ("The state court dismissed his claim as 'procedurally defective' because he could have argued this claim previously on direct appeal to the Appellate Division . . . and did not. The decision of the state court in this case clearly rested on state law."); Sykes v. Scully, No. 90-CV-4302, 1992 WL 151896 at *2 (E.D.N.Y. June 16, 1992) (" §§ 440.10(2)(a) and 440.20(2) mandate that such claims are barred from review. This court therefore treats such claims as exhausted and procedurally barred under state law . . ."); Esquilin v. Walker, No. CV-91-4608, 1992 WL 151903 at *3 (E.D.N.Y. June 16, 1992) ("Collateral review is barred since the claim was raised on direct appeal to the Appellate Division. N.Y. C.P.L. § 440.10(2)(a) (collateral review unavailable for claims raised on direct appeal). . . . Therefore, the claim of prosecutorial misconduct must be denied as barred by an independent and adequate state procedural ground."), aff'd, 990 F.2d 624 (2d Cir. 1993).

petition to include claims raised only in his First Department brief, those claims are unexhausted but deemed exhausted and procedurally barred.

Carvajal's appellate counsel's December 2004 letters to the New York Court of Appeals seeking leave to appeal presented only two issues for appeal: (a) territorial jurisdiction; and (b) ineffective assistance of counsel. (Dkt. No. 13: 12/19/04 & 12/24/04 Carvajal Ct. App. Leave Letters; see pages 26-27 above.) Carvajal's appellate counsel explicitly informed the Court of Appeals that "[w]e raised a number of other issues in our appeal to the Appellate Division . . . . We have not made these issues part of the instant leave application. . . ." (12/24/04 Carvajal Ct. App. Leave Letter at 5-6 n.2.)

The Second Circuit has long held, and the Supreme Court confirmed, that "a state prisoner must present his claims to a state supreme [i.e., highest] court in a petition for discretionary review in order to satisfy the exhaustion requirement." O'Sullivan v. Boerckel, 526 U.S. 838, 839-40, 119 S. Ct. 1728, 173 (1999); accord, e.g., Rosa v. McCray, 396 F.3d 210, 217 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir.), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996 (2005); Calderon v. Keane, 115 Fed. Appx. 455, 457 (2d Cir. 2004); Cotto v. Herbert, 331 F.3d 217, 237 (2d Cir. 2003); Ramirez v. Attorney Gen., 280 F.3d 87, 94 (2d Cir. 2001); Jordan v. LeFevre, 206 F.3d 196, 198 (2d Cir. 2000); Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir.), cert. denied, 531 U.S. 819, 121 S. Ct. 59 (2000); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) ("To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'"), cert. denied, 514 U.S. 1054, 115 S. Ct. 1436 (1995); Grey v. Hoke, 933 F.2d 117, 119 (2d Cir. 1991) ("a petitioner must

present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition"); Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990) ("We have held that the exhaustion requirement mandates that federal claims be presented to the highest court of the pertinent state before a federal court may consider the petition," citing Daye); Daye v. Attorney Gen., 696 F.2d 186, 191 n.3 (2d Cir. 1982) ("Exhaustion of available state remedies requires presentation of the claim to the highest state court from which a decision can be had."), cert. denied, 464 U.S. 1048, 104 S. Ct. 723 (1984).

Thus, since Carvajal only raised territorial jurisdiction and ineffective assistance of counsel in his leave letters and specifically declined to raise all other claims from his First Department brief, Carvajal did not fairly present the additional claims to the New York Court of Appeals, and, as such, those claims are unexhausted and procedurally barred for purposes of habeas review.

Carvajal's unexhausted claims from his First Department brief should be DENIED as barred from habeas review.

**CONCLUSION**

For the reasons set forth above, Carvajal's habeas petition should be DENIED in its entirety. A certificate of appealability should be issued limited to the territorial jurisdiction issue (in light of the dissent in the New York Court of Appeals).

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.

See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon, 500 Pearl Street, Room 540, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge McMahon (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

Dated:     New York, New York
           October 10, 2008

                              Respectfully submitted,

                              Andrew J. Peck
                              United States Magistrate Judge

Copies to:    Alvaro Carvajal
              Thomas B. Litsky, Esq.
              Judge Colleen McMahon

H:\OPIN\CARVAJAL